CARTER PRODUCTS, INC., Petitioner,

v.

FEDERAL TRADE COMMISSION, Respondent.

No. 15373.

United States Court of Appeals Ninth Circuit.

June 16, 1959.

462

William L. Hanaway, Stoddard B. Colby, New York City, Herman Phleger, Alvin J. Rockwell, Brobeck, Phleger & Harrison, San Francisco, Cal., Breed, Abbott & Morgan, New York City, for appellant.

Earl W. Kintner, Gen. Counsel, James E. Corkey, Asst. Gen. Counsel, John W. Carter, Jr., Fletcher G. Cohn, Attys., Federal Trade Comm., Washington, D. C., for appellee.

Before HEALY, BONE and HAMLEY, Circuit Judges.

BONE, Circuit Judge.

The instant case, which has a long history, is before us on a petition by Carter for review of and to set aside a Cease and Desist Order (hereafter "Order") of the Federal Trade Commission (hereafter "Commission") which Order was entered in 1956 at the conclusion of about 149 hearings held before a Hearing Examiner of the Commission. These hearings were held on a complaint of the Commission which charged petitioner Carter Products, Incorporated (hereafter "Carter") with engaging in unfair and deceptive acts and practices in violation of the Federal Trade Commission Act (hereafter the "Act") 15 U.S.C.A. § 41 et seq. The instant litigation was instituted by the Commission's complaint bearing date of May 28, 1943. In the earlier stages of the proceeding, the Commission dismissed its complaint (without prejudice) as to a co-defendant and the case is now before us with Carter alone seeking a review of the Order.

This litigation was previously before this court and the much narrower issues then presented were disposed of by our opinion and judgment reported in 201 F. 2d 446, Carter Products, Inc. v. Federal Trade Commission. On certiorari, the Supreme Court vacated this judgment and remanded the cause to this court with directions. 346 U.S. 327, 74 S.Ct. 2, 98 L.Ed. 4. This court thereupon entered judgment as directed by the mandate of the Supreme Court.

Pursuant to our judgment remanding the cause to the Commission for further hearings, these "further hearings" were held before the Hearing Examiner for the Commission who had presided over the first and original set of hearings. At these supplemental hearings conducted in accordance with our said remand order, Doctors Case and Bollman, two of the *three* expert Commission witnesses whose original cross-examination by Carter this court held had been improperly curtailed and restricted, were tendered to Carter for further cross-examination. Because of the intervening death of Dr. Lockwood (one of these three Commission witnesses in the first hearing) this witness could not be tendered for cross-examination and *all* of the testimony and *all* of the exhibits based upon, or connected with, the testimony of Dr. Lockwood in the first set of hearings were stricken by the Hearing Examiner. For this reason the Lockwood part of the record in the original hearings was not before the

Commission for its consideration when it made and entered its formal Decision along with an entirely new set of Findings of Fact and the new Cease and Desist Order which is before us on this review.[1]

### Preliminary Statement

Because of the great length of the records now before us (which embrace both the original and the supplemental hearings here mentioned) [2] an important aspect of this controversy should be noted. In the mandate of the Supreme Court on its remand, this court was ordered and directed "to reinstate its prior judgment and order after amending it so that it specifically authorizes the Federal Trade Commission to open this proceeding for further evidence *and a new*

1. The formal "Decision" of the Commission promulgated on October 4, 1956 sets forth therein its Findings as to the facts, its Conclusion, and the Cease and Desist Order before us in this review proceeding. In this Decision the Commission points out that because of the death of one of the three witnesses whose cross-examination this court had held was improperly curtailed, the entire testimony and all exhibits introduced through that witness (Dr. Lockwood) were, on Carter's motion, stricken by the Hearing Examiner. The Decision also sets forth the formal recitation that "the Commission, having exhaustively considered the entire record, including the evidence adduced after the remand and the briefs and oral arguments of counsel, now finds that this proceeding is in the interest of the public and makes this its modified and supplemental findings as to the facts and its conclusion drawn therefrom, the same to be in lieu of those contained in its decision of March 28, 1951." (The 1951 decision here referred to was the decision which led Carter to file a petition to review and set aside this order. The review in this court eventuated in our opinion in Carter Products, Inc. v. Federal Trade Commission, 9 Cir., 201 F.2d 446.)

2. In the proceeding now before us both parties also cite and rely upon *all* that appears in the various briefs, records and files lodged in this court in the first review proceeding (201 F.2d 446), save and except all of the testimony of Dr. Lockwood, and all of the exhibits based upon, or connected with his testimony. See our comment on this procedure. The printed transcript filed in this court in that proceeding was in four volumes. This record was also utilized in the supplemental proceedings later held pursuant to the remand directed in our opinion cited supra. The printed transcript filed in this Court and covering the supplemental proceedings appears in ten volumes and, as in the set of printed transcripts in the first review proceedings, appears to contain those parts of the

record regarded as pertinent to the inquiry this court must make.

The size of the printed record now before us suggests the conclusion that the further cross-examination of witnesses supporting the Commission's complaint which was directed in our remand, was extensive and searching and fully conformed to our requirement that counsel for Carter be given "broad latitude" in such cross-examination. The testimony of Doctor Case in the supplemental proceedings occupies 164 pages of the printed transcript on this review. The testimony of Doctor Bollman in these supplemental proceedings occupies 300 pages of the printed transcript.

At the conclusion of the first set of hearings counsel for Carter stated to the Examiner that there were then 15,000 pages of testimony in the record (obviously referring to the full reporter's transcript.)

Aside from the printed record here noted there was lodged with us in the instant review on the merits an enormous array of documents filed as exhibits in the first hearing in connection with the testimony of witnesses in proceedings before the Hearing Examiner. Commission's brief points out that in this first hearing (ending in 1945) 2209 exhibits were introduced in evidence.

The exhibits admitted in evidence in the hearings also include many copies or photostats of announcer's scripts used in radio "broadcasts" in which broadcasts Carter made many elaborate claims concerning the therapeutic action and value of its pills. Along with these radio exhibits were many photostatic copies of advertisements which Carter had caused to be published in various publications in the United States and in which advertising matter the same claims were made concerning the therapeutic action and quality of its pills. In the aggregate, these radio broadcasts and the newspaper and/or magazine ads contained an array of the advertising claims of Carter which the Commission's complaint repeats, and therein asserts were false and misleading, and which the 1956 findings

*order consistent with the Court of Appeals opinion herein."* (Emphasis supplied.)

In the "prior judgment and order" of this court, thus referred to, we set aside the order of the Commission, and specifically indicated therein our reasons for this action. We held that Carter had been denied a fair hearing *because* the Hearing Examiner had unduly and prejudicially restricted Carter's right to cross-examine the three above mentioned expert witnesses who had appeared in support of the allegations of the Commission's complaint; that the error of the examiner was his failure to permit a "broad latitude" in the cross-examination of these three witnesses.[3] So that no doubt might remain concerning the exact reason for our action, we there carefully identified the particular rulings of the Hearing Examiner which we assailed and which we concluded had caused Carter to be denied a fair hearing.[4]

of the Commission as to the facts also assert were false and misleading in many material respects.

3. In its Petition to this court to review and set aside the final Cease and Desist Order of the Commission which was issued on October 4, 1956, Carter avers, inter alia, that this court had held that Doctors Case, Bollman and Lockwood were "key witnesses of the Commission"; that it was the "unjustifiable restrictions" on the cross-examination of these "key witnesses" that deprived Carter of a fair hearing; that on February 9, 1955 the Hearing Examiner issued written rulings denying certain motions of Carter including its motion to strike the testimony of "key witnesses" Doctors Case and Bollman, along with Carter's written "offers of proof and additional evidence" all dated May 26, 1954; that the Hearing Examiner did strike the testimony of Dr. Lockwood; that on March 3, 1955, the Hearing Examiner entered his order closing the case.

Carter's said petition for review further avers that it moved the Commission to disqualify the Hearing Examiner and terminate these proceedings; that on March 3, 1955, and before the Commission could decide the motion to disqualify the Hearing Examiner, that officer filed his Supplemental Report with respect to the proceedings on remand, and therein recommended the issuance by the Commission of the same form of Cease and Desist Order as previously entered by the Commission in 1951; that on September 20, 1955, the Commission denied Carter's motion to disqualify the Examiner, strike his Supplemental Report, and terminate these proceedings; that on appeal to the Commission Carter renewed its said motions and filed its proposed findings and conclusions of law; that thereafter and on October 4, 1956, the Commission issued its Cease and Desist Order in substantially identical form with its previous Cease and Desist Order dated March 28, 1951. (See footnote 1, supra.)

Carter prayed that this court strike the Supplemental Report of the Hearing Examiner, terminate the instant proceeding, and reverse and set aside the Cease and Desist Order now before us.

4. It was this particular curtailment of cross-examination in the original hearings which caused this court to set aside the Commission's order and led this court to declare in its opinion and decision, 201 F.2d at page 448, that "Questions pertaining to the sufficiency of the evidence or to the merits are not presented by the petition. What is claimed, principally, is that a fair hearing was denied petitioner in that the trial examiner unduly and prejudicially restricted its right of cross-examining certain of the Commission's expert witnesses upon whose testimony, in large measure, the [March 28, 1951] findings and order were based. The witnesses in question were Doctors Carlson, Bollman, Lockwood and Case. We are of the opinion that petitioner's claim is well grounded in respect of the three experts last named, but not in respect of the witness Carlson."

Relative to this same "principal claim" of Carter, we ended our opinion with the further comment (at page 454) "It is argued that there was ample evidence from other quarters to sustain the findings and order of the Commission, hence the rulings, even if wrong, were not prejudicial. We are of the opinion, however, that the cumulative effect of these unjustifiable restrictions on the cross-examination of key witnesses for the Commission was to deprive petitioner of a fair hearing. Such being the case the court is not disposed to speculate as to what would have been the outcome had a fair and impartial hearing been accorded."

In discussing at one point in our said opinion the latitude to be allowed in the

■ It is also our firm conclusion that if the *new order* of the. Commission so authorized in our order of remand was to be truly "consistent with" our opinion (as directed by the Supreme Court) this *new order* would have to be bottomed on the evidence and testimony received in the original hearings (except where appropriately stricken as in the case of Dr. Lockwood) *plus* the "further evidence" adduced in the renewed and additional cross-examination of two of the Commission's above noted expert witnesses in the supplemental hearings which followed the remand. If it be the view of Carter that our order of remand required a proceeding *de novo*, or was properly to be construed (in light of the direction from the Supreme Court) as an invitation or suggestion that the proceedings might (also) be opened for the purpose of receiving additional testimony from witnesses other than the two expert witnesses we have mentioned (Case and Bollman) we must disagree with Carter since our conclusion is to the contrary.

After Case and Bollman were further cross-examined at length in the following supplemental hearings above referred to, and on October 4, 1956, the Commission made and entered an entirely new and second set of Findings of Fact, a Conclusion of Law, its formal Decision (see footnote 1) and the Cease and Desist Order [5] which is here involved. A formal Opinion of the Commission was also filed

---

cross-examination of expert witnesses, we referred to the fact that the Examiner imposed upon Carter the condition that it make Dr. Lockwood its own witness and we characterized this action (at page 452) as "flagrant error." As noted supra in this opinion, the death of Dr. Lockwood caused the Hearing Examiner to later strike from the records in this proceeding all of the testimony and all of the exhibits based upon, or connected with, the testimony of Dr. Lockwood in the first set of hearings. As a consequence of this action, the record shows that the new set of Findings of Fact and the new Cease and Desist Order now before us and which were entered by the Commission under date of October 4, 1956, do not rest in any degree upon the Lockwood testimony and the exhibits based upon or connected therewith, and in our view the "flagrant error" we mentioned has ceased to be a factor in this proceeding.

Because a question arose concerning the probative value and admissibility of testimony relating to experiments on dogs and human patients, this court also took occasion to comment upon this phase of the proceedings before the Hearing Examiner. In footnote 1 of our previous decision, supra, (at page 448) we said: "Petitioner also urges that fatal error was committed in admitting evidence pertaining to certain experiments on dogs and human patients. In our opinion the objection to these experiments, several of which will be mentioned hereafter, goes to their weight only, not to their admissibility."

On this review we find no reason to part company with the views we previously expressed in this footnote.

5. The formal Decision of the Commission embodies its final Cease and Desist Order, its Conclusion of Law, and its "Findings as to the Facts." The Conclusion of Law and the Cease and Desist Order now before us read as follows:

Conclusion

"The acts and practices of the respondent, as herein found, are all to the prejudice and injury of the public and constitute unfair and deceptive acts and practices in commerce within the intent and meaning of the Federal Trade Commission Act."

Final Order

"It Is Ordered that the respondent, Carter Products, Inc., a corporation, and its officers, agents, representatives and employees, directly or through any corporate or other device, in connection with the offering for sale, sale, or distribution of the product now designated 'Carter's Little Liver Pills,' or any other product of substantially similar composition or possessing substantially similar properties under whatever name sold, do forthwith cease and desist from:

"(1) Disseminating or causing to be disseminated any advertisement by means of the United States mails or by any means in commerce, as 'commerce' is defined in the Federal Trade Commission Act, which advertisement represents directly or by implication—

"(a) That said preparation represents a fundamental principle of nature in self-treatment;

"(b) That said preparation will bring on or restore regularity of bowel movement, or is a cure, remedy or competent or effective treatment for constipation, or has any beneficial value in the treatment of any of the symptoms thereof in excess

on October 4, 1956. For reference to date and place of publication of an official copy of the here noted Commission's Cease and Desist Order, see last paragraph of footnote 5.

Applicable provisions of the Act with which we are here concerned are:

"Sec. 5(a) (1). [Section 45(a) (1) of Title 15 U.S.C.A.] * * * unfair or deceptive acts or practices in commerce, are declared unlawful."

·of the temporary relief afforded by its laxative action;

"(c) That said preparation does not ·contain strong medicines;

"(d) That said preparation is unqualifiedly safe;

"(e) That said preparation is an effective treatment for sluggish liver function or that it will have any therapeutic action ·on any condition, disease or disorder of the liver;

"(f) That said preparation will make bile flow freely, increase or beneficially influence the formation, secretion or flow of bile, or prevent or overcome discomforts ·caused by over-indulgence in food or other pleasures;

"(g) That said preparation will provide two-way relief or that it possesses therapeutic properties in addition to those afforded by laxative action;

"(h) That said preparation will cause the proper flow of, or beneficially affect, the gastric juices or digestive juices, or lessen food decay;

"(i) That said preparation is based on the fundamental principle of the operation of the digestive system;

"(j) That said preparation will help food digestion, or regulate digestion or the digestive system;

"(k) That said preparation will have any influence in inducing a state of 'bounce,' vigor or well-being except in those instances in which a lack thereof is due solely to constipation;

"(l) That constipation poisons the body;

"(m) That said preparation has any value in the treatment of headache, ugly complexion, bad breath, coated tongue or a bad taste in the mouth, or for those conditions in which an individual feels 'Down-and-out,' 'blue,' 'down-in-the-dumps,' 'worn out,' 'sunk,' 'logy,' 'depressed,' 'sluggish,' 'all-in,' 'listless,' 'mean,' 'low,' 'cross,' 'tired,' 'stuffy,' 'heavy,' 'miserable,' 'sour,' 'grouchy,' 'irritable,' 'cranky,' 'peevish,' 'fagged out,' 'dull,' 'sullen,' 'what's-the-use,' 'bogged

"Sec. 5(a) (6). [Section 45(a) (6) of Title 15 U.S.C.A.] The Commission is empowered and directed to prevent persons, partnerships, or corporations * * * from using * * * unfair or deceptive acts or practices in commerce."

Pursuant to the order authorizing the Commission to open the proceedings for the further evidence mentioned and for entry of a new order consistent with the

down,' 'grumpy,' 'run-down,' or 'gloomy,' in excess of such temporary relief therefrom as may be afforded by an evacuation of the bowels in those cases in which such symptoms or conditions are associated with and caused by constipation;

"(n) That said preparation is a competent or effective treatment for indigestion or retarded digestion;

"(o) That said preparation is a competent or effective treatment for biliousness.

"(2) Disseminating or causing to be disseminated any advertisement by means of the United States mails or by any means in commerce, as 'commerce' is defined in the Federal Trade Commission Act, in which the word 'Liver' is used in the trade name for the respondent's preparation.

"(3) Disseminating or causing to be disseminated any advertisement by any means for the purpose of inducing or which is likely to induce, directly or indirectly, the purchase of said product in commerce, as 'commerce' is defined in the Federal Trade Commission Act, which advertisement contains any representation prohibited in paragraphs (1) and (2) hereof.

"It Is Further Ordered that the charges of the complaint as they relate to the respondent Street & Finney, a corporation, be, and the same hereby are, dismissed without prejudice to the right of the Commission to take such further action as future conditions may warrant.

"It Is Further Ordered that the respondent, Carter Products, Inc., shall, within sixty (60) days after service upon it of this order, file with the Commission a report in writing setting forth in detail the manner and form in which it has complied with this order.

"By the Commission, Commissioner Mason not participating.

"Issued: October 4, 1956."

An official copy of the above Cease and Desist Order was published in the October 23, 1956 issue of the Federal Register, Volume 21, Number 206.

opinion of this court, the Commission did, by order, reopen the proceeding and refer it to the Hearing Examiner "for such further proceedings as may be necessary to correct the errors in the original hearings as specified by the Court of Appeals." The examiner was directed to file "a report upon the additional evidence and state the changes, if any, he wishes to make in his original recommended decision as a result of such additional evidence."

*After* an order of the examiner was later made closing the record and denying Carter's motion and offers of certain proof, Carter (on April 18, 1955) filed a motion to disqualify the Hearing Examiner from taking any further action in this proceeding, and for an order wholly terminating these proceedings because of bias of the examiner. Subsequently, the examiner filed his supplemental report and his recommendation. Later on, and in an opinion carefully analyzing the issues tendered by the said motion, the Commission denied Carter's motion to disqualify the examiner and to terminate the proceedings.

We are of the opinion that the question whether the Hearing Examiner should have been disqualified (for the reason urged by Carter) and in addition the hearings terminated, presented issues the disposition of which rested in the sound discretion of the Commission. From the record as a whole we cannot conclude as a matter of law that the Commission abused its discretion when it denied Carter's said motion for the relief here mentioned.

As the Commission emphasizes in its brief, the issues in this case were adjudicated by the Commission under a procedure in which the examiner files only a "recommended decision," i. e., a "report upon the evidence" as provided by a rule of the Commission in effect when the proceedings were instituted. Therefore, the examiner in the instant matter did not make an "initial decision," as is required under the present procedure. It should be noted that in this proceeding the Commission made its own formal findings as to the facts, its own conclusion and issued its own order to cease and desist. While the Commission's "rule" here referred to required the trial examiner to make a "report" upon the evidence to the Commission, this controlling rule also provided that such a report was advisory only and not binding upon the Commission.

For many years Carter has engaged in the sale and distribution in interstate commerce of its laxative pills sold under the trade-mark or trade name of "Carter's Little Liver Pills." These pills are admittedly sold as a laxative and admittedly contain only two active drugs—aloes and podophyllum. On this review the Commission takes the position that the evidence adduced in support of the allegations of the complaint clearly establishes that these two drugs are recognized as "irritative laxatives"; that this evidence shows that Carter repeatedly made, and is making, false representations in its general advertising in commerce that use of its medicinal preparation will stimulate the production and flow of liver bile thereby rapidly improving the health of users; that Carter also falsely claims in this widely disseminated advertising that use of its pills provides an effective treatment for a vast array of common human ailments, including disorders and diseases of the liver, and that many of these claims constitute false representations in advertising; that this sort of conduct constitutes unfair and deceptive acts and practices in interstate commerce within the meaning of Section 5 of the Federal Trade Commission Act, supra. Highlighting the position of Commission counsel is their assertion that the actual area of factual *conflict* in this proceeding relates simply and solely to what influence, if any, Carter's laxative pill will have on the production and flow of liver bile. Our examination of the medical evidence and testimony in the record leads us to conclude that this position of counsel finds strong support in the records. (See footnotes 7 and 8, infra.)

## The Complaint

The Commission's complaint directed against the advertising claims of Carter covers sixteen pages of the printed transcript and sets forth a long array of charges. In general, it avers that in furtherance of the sale and distribution of its medicinal preparation known as "Carter's Little Liver Pills," Carter has disseminated and now is disseminating many false and misleading advertisements to the general public concerning this preparation, and also making disparaging statements about the drug calomel and other laxative preparations, this by use of the United States mails and by various means in commerce as defined by the Act. The complaint charges that the dissemination of this false advertising by Carter was for the purpose of inducing, and was likely to induce, directly or indirectly, the purchase of Carter's preparation "Carter's Little Liver Pills" in commerce, as "commerce" is defined in the Act.

The length of the complaint and the answer of Carter requires that we summarize these pleadings. In our summary of the complaint we shall indicate the general character of the charges appearing in some of the paragraphs wherein certain advertising claims of Carter are carefully specified in detail, but we do not undertake to list all of the advertising claims noted in the complaint. In the hearings, the proof that a great array of these advertising claims had been made by Carter by publication in newspaper ads and in "commercial announcements" in radio broadcasts, was presented by introducing (apparently without objection) copies of these ads and the radio announcers' scripts. To list at this point all of the claims thus shown concerning the alleged merits of Carter's preparation would expand this opinion beyond any reasonable length. The Commission's complaint however sets them out in elaborate detail.

As we shall later note, the Cease and Desist Order of the Commission now before us (footnote 5, supra) does not enjoin the use of *all* of the many advertising claims of Carter described in the complaint; it specifically enjoins Carter from use of certain advertising claims which are carefully described in the Order.

The complaint (paragraph 6), inter alia, charges in lengthy detail that by and through the use of words, phrases, statements and representations appearing in the advertising material disseminated and caused to be disseminated by Carter (as above noted) which purport to be descriptive of the preparation "Carter's Little Liver Pills," and descriptive of their therapeutic action, and the result and value of the action of this preparation, Carter therein represents directly and by implication, among other things, that its preparation:—represents a fundamental principle of nature in self-treatment; is a competent and effective treatment for a condition designated as a "sluggish liver"; will "wake up the flow of [liver] bile"; is "effective in making bile flow freely by getting the liver back to normal and back to producing"; will cause the proper flow of gastric juices, natural vital digestive juices and vital alkaline juices; is based on the fundamental principle of the operation of the digestive system, and will "help food digestion," "lessen food decay," regulate digestion and the digestive system; will bring on, help and restore regularity and is a cure and remedy and constitutes a competent and effective treatment for constipation; will clear away the "dark clouds of listlessness and despondency" and "give one's personality a chance"; will "keep up one's pep and vigor"; will "make one feel good and up to par again" and "keep one smiling and happy"; will "eliminate those uncomfortable feelings" that cause a bad disposition and will keep good dispositions "cheerful, happy and a regular thing"; and will help in more ways than one to make one feel better again fast

and differently and will provide *two-way relief*.[6]

The complaint further charges (in paragraph 6) inter alia, that in its said advertising Carter has represented directly and by implication that its preparation "follows nature's own order for regularity and so regulates the digestive process that, if it is taken as directed before retiring at night, one will awaken the following morning feeling the way one wants to feel, but he will also discover that such use (as directed) of Carter's preparation will bring about (as specifically enumerated in the complaint) some 44 (additional) physical reactions and manifestations in the user's body all indicating the restoration of pep, physical vigor and a feeling of well-being. It is further charged in paragraph 6 that Carter's advertising has represented that use of its preparation will so influence the production or flow of liver bile that one can overeat and overindulge in "good times" without the usual ordinary discomfiture resulting therefrom, and that Carter's product will overcome the effects that ordinarily follow such indis-

6. In many of Carter's representations appearing in its advertising material placed in evidence, there appears the claim that Carter's preparation will give the user "two-way relief." This "two-way relief" was generally described by Carter as relief from "irregularity" without disturbing digestion, and also a stimulation of the liver which would cause a flow of two pints of bile per day. Such advertisements frequently emphasized that Carter's pills were a "laxative plus" because they provided this sort of "two-way relief." The Commission's Cease and Desist Order enjoins Carter from further use of the term "two-way relief" in its advertising. See note 5, supra.

Many of the exhibits in evidence were extracts from radio scripts used in national promotion of sales of Carter's pills. These radio advertisements lauded the unusual therapeutic virtues of Carter's pills, emphasizing that they were "Laxative Plus" which provided a unique form of gentle "two-way relief" not to be found in any other simple laxative, including calomel. Just below we quote the language used by Carter in some of the many radio advertising scripts here mentioned.

"They [Carter's Little Liver Pills] provide two-way relief—relief you cannot expect from a simple laxative alone. First, they help wake up the flow of bile—a vital digestive juice. And they usually start to do this within 30 minutes after taking. Second, they help restore regularity. In days gone by, folks took calomel to get results like this. But today you get gentle relief from Carter's without the ordeal of calomel."

"Scientific facts show it takes a two-way treatment to get the vital digestive juice [bile] flowing quickly—and to relieve sluggishness without disturbing digestion. Now—this type of two-way treatment follows Nature's own order for regularity.—Remember—many ordinary simple laxatives *DON'T*—but Carter's Little Liver Pills *DO* give this two-way treatment you want. Only genuine Carter's have this proven formula."

"Medical knowledge proves that Nature must produce about two full pints of the vital digestive juice [bile] your liver makes each day. Otherwise, your food may not digest properly—and leave you feeling dull, headachy, sluggish. Scientific facts show it takes a two-way treatment to get the vital digestive juice flowing quickly—and to relieve sluggishness without disturbing digestion. Now—this type of two-way treatment follows Nature's own order for regularity."

"First—Carter's starts your liver bile flowing quickly. Second—Carter's gently help you to that glorious feeling that goes with regularity."

"One of the reasons for irregularity is that sometimes the alkaline digestive juices don't flow fast enough to help digest the food you eat. Another reason is that sometimes the peristaltic waves slow down. Many laxatives have no effect on the Alkaline Juices I'm talking about. Many of 'em only stimulate the peristaltic waves. But there's one laxative that may increase the flow of these vital Alkaline Juices. That's why we call it a Laxative Plus. By this time, I'm sure most of you know that I'm talking about Carter's Little Liver Pills."

"When two pints of that juice [bile] flow through our lower food canal every day, irregularity, gas, bloating, fatty indigestion below the belt and bilious grouch may go away. Then many of us may feel full of joy like a barefoot boy. Carter's Little Liver Pills are made of two simple vegetable medicines. No calomel in them."

cretions, this by reason of its stimulating influence on the production or flow of liver bile.

The complaint also charges in paragraph 6, inter alia, that in its said advertising Carter has represented that its preparation "does not contain any strong medicine" and is "safe to use"; that "it is not an ordinary laxative but possesses therapeutic properties over and above and in addition to its laxative action." The complaint, in paragraph 7, alleges, inter alia, that Carter's advertising material has (also) disseminated and caused to be disseminated, as aforesaid, material which purports to describe approximately 66 abnormal physical conditions and distressing mental attitudes (specifically noted in the complaint) and as to these it is alleged by the Commission that Carter advertised that "if any individual feels" *any* of these "conditions," i. e., suffers from *any* of them, "then such person is exhibiting symptoms, manifestations or conditions indicating irregularity of bowel movement or constipation; that irregularity of bowel movement or constipation is the cause of such symptoms, manifestations or conditions"; that "the preparation 'Carter's Little Liver Pills' is a competent and effective treatment for such symptoms, manifestations and conditions." Also, that Carter further represented in its advertising material, among other things, in the manner, means and method aforesaid, that constipation poisons one's body.

Paragraph 8 of the complaint charges that advertising material has been disseminated in commerce by Carter in which material it purports to describe the "therapeutic action" of its preparation, and the result and greater value of such action in an invidious comparison with the value of calomel and other laxative preparations or compounds sold on the market. In this connection, it is charged that Carter's advertising material has represented directly and by implication, among other things, that calomel, "is a harsh, drastic, dangerous laxative, the use of which is an ordeal and

puts one through the wringer"; that "other ordinary laxative preparations or compounds sold on the market do not possess the same desirable therapeutic action nor will the use thereof be as effective, or produce as beneficial results," as Carter's product, and that this product "is superior to such laxative preparations or compounds."

Paragraph 9 of the complaint also charges, inter alia, that all of Carter's advertising claims (noted above) are "grossly exaggerated, false and misleading," and it further avers that Carter's Little Liver Pills do not represent a fundamental principle of nature in self-treatment; that they are not effective in making liver bile flow freely; that they will not get the liver back to normal or back to "producing" (bile), nor will they cause the proper flow of the gastric juices, natural vital digestive juices or vital alkaline juices; that Carter's pills are not based on the fundamental principle of the operation of the digestive system, and will not help "food digestion" nor lessen "food decay," nor will they regulate digestion or the digestive system; that to the contrary, Carter's preparation "is likely to interfere with the digestive process," and will not bring on, help or restore "regularity"; that it does not constitute a competent or effective treatment for constipation, and it will not produce in the users of the preparation the 36 different physical indications of abounding health and vitality (enumerated in this paragraph) and which Carter had advertised will result from the use of its preparation. Paragraph 9 further charges that Carter's preparation will not influence the production or flow of liver bile so as to enable one to overeat or overindulge in "good times" without experiencing the usual discomforts resulting therefrom; that it will not (if taken as directed by Carter) cause one to awaken feeling better (in the 36 ways specified in this paragraph) as advertised by Carter; that Carter's preparation does "contain strong medicines," and that "it is not safe to use under all circumstances"—that it is "an

ordinary laxative or cathartic and possesses no therapeutic properties over, above, or in addition to, its laxative action."

Paragraph 10 of the complaint refers to and describes approximately 59 distressing physical conditions and unhappy mental attitudes mentioned in Carter's advertising. (See reference in paragraph 7 to these and/or similar physical troubles which Carter's advertising indicated would be eliminated by use of Carter's preparation.) Paragraph 10 charges that the existence of one or more of such 59 symptoms, manifestations or conditions does not indicate that the individual is suffering from irregularity of bowel movement or from constipation; that Carter's preparation is not a competent or effective treatment for such symptoms, manifestations or conditions; that when such symptoms or manifestations are caused by, or associated with, irregularity of bowel movement, then Carter's preparation "will have no greater therapeutic value in the treatment thereof than the temporary relief afforded by an evacuation of the bowels." It is further averred in this paragraph that Carter's pills "will have no therapeutic action, effect or influence on the secretion and flow of bile and will therefore have no therapeutic value, whatever, in the treatment of any symptom, manifestation or condition, under whatever name or names designated, caused by or due to disorders in the secretion and flow of bile—that according to the consensus of opinion of recognized scientific and medical authority, constipation does not poison one's body."

Paragraph 11 of the complaint alleges that calomel used with proper caution and given in proper doses for, and taken in a proper manner to act as, a laxative, is not dangerous; and it is no more drastic in its action, nor is the taking thereof any more of "an ordeal," nor does it "put one through the wringer" to any greater degree than Carter's preparation which is an ordinary laxative or cathartic possessing no other therapeutic property; that the action of Carter's preparation is no different from, nor will the results obtained from its use be any more effective or beneficial than, that obtained from the use of many other ordinary laxative preparations and compounds containing vegetable laxative or cathartic drugs sold on the market; that Carter's preparation is not superior to such other laxative preparations or compounds.

The complaint (paragraph 12) also generally charges, inter alia, that Carter engaged in further false and misleading representations in reference to its preparation through and by the use of the word "Liver" in the name "Carter's Little Liver Pills" used in its advertising material to identify and describe the medicinal preparation it sold and distributed; that Carter there represented, directly and by implication, that its preparation is for use in the treatment of conditions, disorders and diseases of the liver and that said preparation will have some therapeutic action, effect and influence on the liver. The complaint further alleges that Carter's pills contain no ingredient or ingredients, recognized by competent medical or scientific authority, either alone or in any combination of the one with the other, as having any therapeutic value in the treatment of any condition, disorder or disease of the liver, or that the ingredients in the said pills, alone or in any combination of the one with the other, will have any action, effect or influence, corrective or otherwise on the liver.

The complaint (paragraph 13) further avers that Carter's advertisements were false inasmuch as they represent its pills as a competent, effective, safe treatment for common and recurrent pains and fail to reveal facts material in the light of such representations or material in respect to the consequences that may result from the use of the preparation under conditions described in the said advertisements or under such conditions as are customary or usual; that Carter's preparation is an irritant laxative or cathartic which is potentially dangerous if taken by persons suffering from ab-

dominal pains, nausea, vomiting or other symptoms of appendicitis.

The complaint avers generally in paragraph 14 that Carter's advertising material does not accurately disclose or describe its preparation or the true results to be obtained from its use, all of which misleads the public into the erroneous and mistaken belief (1) that the use of Carter's preparation will have the effect and accomplish the results claimed for it by Carter, as set forth in paragraphs 6 and 7 of the complaint, (2) that its preparation is superior to calomel and superior to other ordinary laxatives sold on the market, (3) that it will have some therapeutic action, effect and influence on the liver, and/or that it is for use in the treatment of conditions, disorders and diseases of the liver, (4) that it is safe to take. The complaint further avers in this paragraph that Carter's advertising material "has had and now has the tendency and capacity to, and might easily, induce a substantial portion of the purchasing public, because of such erroneous and mistaken beliefs, to purchase" Carter's preparation.

And see our later reference to dismissal of two charges set forth in the Commission's complaint. Commission's finding No. 19 orders dismissal of these two charges.

The complaint finally avers that the acts and practices of Carter (in its noted advertising) are all to the prejudice and injury of the public and constitute unfair and deceptive acts and practices in commerce within the intent and meaning of the Act.

### Carter's Answer

Carter filed an answer in July, 1943 in which it admitted its identity, the sale of its product and the dissemination of advertisments containing statements and representations concerning its laxative pill, a list of which is set forth in the Commission's complaint.

While admitting in its answer the use of certain of the representations appearing in its advertising material (as shown by the evidence) the answer averred that as to such representations the Commission's complaint was so framed as to attribute to many of Carter's therapeutic claims *a meaning* which Carter did not intend in making the claims. It further averred therein that some of the advertising claims noted in the complaint had been abandoned for a long time; that some of these advertising claims were regarded by Carter "as permissible trade puffery or permissible sales talk," and others as being supported by competent evidence. The answer charged that paragraph 6 of the complaint "contains facts, innuendoes and inferences built upon inferences."

The answer admitted that many of the words and phrases set forth in paragraph 7 of the complaint had been used to advertise Carter's pills, and denied that it had claimed that constipation poisons one's body. It averred that the drugs in its pills "act upon the liver to stimulate the flow of bile," and denied that it had ever represented its product "for treatment of disorders of the liver generally."

Carter finally averred that its advertising of its product "truthfully describe its properties"; that "the mere fact that one may be mistaken in some respects with regard to the physiological action of Carter's Little Liver Pills does not establish as a matter of law that the seller is guilty of unfair or deceptive acts or practices or that its advertising is misleading in a material respect."

Without going further into detail, it is our view that the averments in Carter's answer put in issue all of the material averments in the Commission's complaint.

The pleadings as thus framed remained unchanged through all stages of the instant litigation. After issue was thus joined, *the first series* of extended hearings were held before an examiner, beginning in November 1943 and ending in November 1945. Upon completion of these first hearings, the examiner made his formal "Report" to the Commission on July 22, 1946. In an earlier part of this opinion we called attention to the

procedures which were standard practice in proceedings before the Commission at the time this controversy began. The proceedings were therefore *continued under this practice* after this court had remanded the cause for such further proceedings.

This (1946) "Report" of the Hearing Examiner occupies (with its two addendums) approximately 267 pages of the printed transcript. It sets forth a carefully detailed analysis of the testimony and evidence submitted in the first series of hearings. It includes his conclusions of fact and law and a recommendation that the Commission issue a Cease and Desist Order prohibiting Carter (and its then co-respondent Street & Finney, a New York Corporation which had been handling Carter's advertising) from continuing the acts and practices which the examiner found to be in violation of the Act.

In the Commission's *first* disposition of this case by its Cease and Desist Order issued in 1951 the Commission followed the then applicable (and above referred to) procedure in which the Hearing Examiner filed only a "recommended decision," this being done pursuant to a rule of the Commission in effect when the proceedings were originally instituted in 1943. In the second series of hearings held after and pursuant to our order of remand under the order of the Supreme Court, the Hearing Examiner and the Commission continued to proceed under the above noted Commission's rules effective in 1943, since the remand merely continued proceedings which had been interrupted by the first review proceeding in this court. In disposing of the issues arising out of the second series of hearings following the remand, the Hearing Examiner continued to follow the said 1943 Commission rules and did not make an "initial decision" *as is required by procedures now followed*. In the (1956) record before us on this review the Commission ultimately made its own findings as to the facts, its own Conclusion of Law, and formulated its own Order to Cease and Desist. Thus, its ultimate decision now before us on review was not one fashioned by the Hearing Examiner but was that of the Commission itself. This decision was rested upon the entire record in *all* of the various proceedings had in this controversy save and except that part relating to the testimony of Dr. Lockwood.

At the conclusion of all testimony taken *after* our above noted order of remand, and under date of March 31, 1955, the Hearing Examiner filed his Supplemental Report upon the additional evidence received, along with his recommendations to the Commission. In this document the Hearing Examiner, among other matters, described certain past proceedings had in this litigation and this recital was followed by his description of the additional evidence presented by and through the testimony of Doctors Case and Bollman (see footnote 2) and comments on contentions raised by counsel for Carter.

This (1955) Supplemental Report ends with the "Conclusion" of the Hearing Examiner wherein he stated that he finds no reason to alter, change, amend, add to, or detract from, his original Findings as to the Facts, Conclusion of Law and Recommendation for Appropriate Action, all as set forth in his above noted original Report to the Commission of July 22, 1946. The Hearing Officer also stated therein that "the deletion of the testimony of (the deceased) Dr. Lockwood in nowise detracts from the validity of this decision to adhere to the original recommendations, nor does the disregard of Dr. Bollman's testimony in support of [a certain Commission exhibit] alter such determination * * *." The "Conclusion" ends with the Examiner's general comment that "because of the additional testimony [of Doctors Case and Bollman] and the opportunity to again study, review and appraise the entire record after a lapse of nine years [he] is firm in his conviction that the record fully justifies all findings, conclusions and recommendations originally

made [in 1946] and hereby renews his recommendations that an appropriate order be issued consonant therewith."

### The "Decision" Of The Commission

Prior to the making and entry of the final and formal "Decision" of the Commission before us in the instant proceeding (which document bears date of October 4, 1956) counsel for both sides filed briefs with the Commission in which they tendered comprehensive arguments on the merits of the entire case.

Following the filing of these briefs counsel presented oral arguments before the Commission on June 18, 1956 in support of the contentions set forth in their respective briefs. Thereafter, the "Decision" above mentioned was entered. Among other matters discussed in this Decision, the Commission made a preliminary comment on certain antecedent procedures in this prolonged controversy including therein a reference to the denial by the Commission of a motion by Carter (referred to supra in this opinion) to disqualify the Hearing Examiner for alleged bias and prejudice. The Decision also refers to the oral arguments of counsel presented before the Commission on June 18, 1956.

A formal "Opinion" of the Commission was also entered on October 4, 1956. In this Opinion the Commission also discusses the (April 18, 1955) motion of Carter to disqualify the Hearing Examiner who had previously taken all of the testimony in this proceeding. In this motion Carter prayed for an order disqualifying the said Hearing Officer and sought *a hearing de novo* before another hearing officer, or in the alternative, an order dismissing the entire proceeding for failure of proof. The Commission's Opinion rejected Carter's above noted motion and, inter alia, recites that its "Decision" represents "the result of its own exhaustive examination of the record." Earlier in this opinion we held that the Commission did not abuse its discretion in rejecting Carter's said motion.

The "Decision" of the Commission contains the formal findings of ultimate probative facts developed in the evidence and testimony in this proceeding and occupies approximately 50 pages of the printed transcript in cause No. 15373. Of necessity we must confine ourselves to a summary of the findings which deal immediately and directly with what we regard as the most pertinent fact issues in this case. Preliminarily, the Commission recites that having "exhaustively considered the entire record, including the evidence adduced after the remand and [after] the briefs and oral arguments of counsel," it "makes this its modified and supplemental findings as to the facts and its conclusion drawn therefrom, the same to be in lieu of those contained in its decision of March 28, 1951." (See footnote 1.)

After other preliminary findings in the Decision as to Carter's status as a corporate entity and as a litigant, the findings refer to the sale practices of Carter which bring its Commission-condemned advertising operations into the current of interstate commerce and portray its use of this advertising material as one designed for the purpose of inducing, directly or indirectly, the purchase of its medicinal preparation in such commerce. The Decision then sets forth various findings of fact as to the precise nature and character of the advertising representations disseminated by Carter in commerce all as more completely charged in the Commission's complaint and as shown in detail in the exhibits in evidence.

██ Both the Decision and the Opinion of the Commission contain pointed references to the briefs of counsel and their oral argument on the merits at the conclusion of all proceedings before the Commission. In the margin we comment on this phase of the proceedings.[7]

---

7. The final oral arguments before the Commission were presented on June 18, 1956. They appear in Volume 8 of the

Printed transcript in proceeding No. 15373 in this court at pp. 3472 to 3530, inclusive. The findings of fact set forth

The Commission's Findings Of Fact

The ultimate findings of fact entered by the Commission appear in and as part of its Decision dated October 4, 1956.

These findings are set forth in twenty separate and numbered paragraphs and the length of this instrument makes it necessary to summarize certain of the

in the final Decision of the Commission and in its formal Opinion contain several comments upon these oral arguments but their length forbids inclusion in this opinion. However, a brief reference to the arguments before the Commission, and the very significant contentions therein voiced, will be helpful in arriving at a definite understanding of just what opposing counsel regarded as the exact issue or issues which had to be finally decided by the Commission. The great value of these arguments lies in their refreshing candor and frankness, and the purpose of counsel was to narrow the issues facing the Commission to the limited area of controversy there clearly portrayed by counsel. And additionally, it is to be noted that subsequently (and in four of its later noted findings) the Commission on its own motion also materially narrowed the material fact issues which this court is called upon to resolve in its review of the record.

In his oral argument, counsel for Carter stated to the Commission: "I have argued in my brief that one of the tasks this Commission has before it is to review the entire record and make new findings, because the old ones [set out at pages 305 to 333 of the printed transcript in cause No. 12940 in this court] are out the window. You can't make findings on the basis of an incomplete record."

(We have noted in an earlier part of this opinion, that following the second set of hearings the Commission did make and enter an entirely new, second, final and controlling set of Findings of Fact, a Conclusion of Law based thereon, and a formal Cease and Desist Order, these being the instruments made and filed on October 4, 1956.) (See footnotes 1 and 2, supra.)

Concerning just what material issues had finally emerged as the end result of the two series of hearings before the Hearing Examiner during which proceedings (according to Carter's counsel) "thousands of exhibits" had been introduced in evidence, Carter's counsel frankly stated to the Commission: "I think over the course of the years, it has pretty much simmered down to two issues, one, whether or not the ingredients of Carter's Pills—namely aloes and podophyllin will stimulate the flow of bile from the

liver. The other is a corollary that flows from that, is the company entitled to use the word 'liver' in the title of its name, Carter's Little Liver Pills, as it has done now, I think, for about 75 years?" This statement is certainly blunt enough to remove any and all doubt as to what Carter regarded as the controlling issues which remained for final determination by the Commission.

The here noted oral statement of counsel for Carter was clean-cut and distinctly posed the ultimate issue for decision as Carter would have the Commission see it. As we read its briefs on this review, counsel for the Commission does not aggressively part company with Carter's statement of the dominant and controlling issue before the Commission.

However, the Carter briefs on this review range over the entire body of testimony. Vigorous exception is generally taken to most of the ultimate findings of fact made by the Commission, and the basic argument is that in reviewing and analyzing the evidence and testimony in its aforesaid final Decision and Opinion rendered in 1956, the Commission did not squarely face up to the facts developed in the hearings, but to the contrary, it unfairly slanted its fact determinations thereby wilfully distorting the real fact picture presented by the testimony. On the basis of the expert testimony in the record, Carter indicts as grossly unfair and prejudicial the Commission's general comments on the testimony and evidence. It charges that the record there made by the Commission demonstrates its biased attitude, a condition which caused it to improperly and unjustly weigh the evidence and thereby deny Carter due process of law.

The final Decision and the final Opinion of the Commission occupy approximately 62 pages of the printed transcript. In these two pronouncements the Commission appears to have squarely met the dominating issue so clearly posed in Carter's final oral argument before the Commission. We think that the extensive and careful analysis given the testimony of certain of the most important expert witnesses serves to clearly indicate a sincere desire on the part of the Commission to reach to the heart of what Carter's counsel frankly assured the Commission in oral argument was the crucial issue for determination. We are convinced

Commission's many fact determinations which we consider particularly pertinent to our present inquiry.

(as was the Commission) that Carter was trying to correctly identify the controlling issue finally tendered in this litigation.

Since we are convinced that the persuasiveness of the great mass of expert testimony and other evidence and the probative weight to attach to it, presented fact issues which were clearly for consideration of and determination by the Commission, we must and do conclude and therefore hold that the Commission acted well within the legitimate orbit of its fact finding powers when it determined, as facts (1) whether or not the expert medical testimony and evidence, taken as a whole, compelled the conclusion that use of Carter's pills, as advertised, would in any way increase the secretion and/or flow of liver bile, and thereby affect the human biliary system, (2) whether or not this same testimony and evidence, taken as a whole, established the existence of any relationship between bile flow and constipation which would or could be affected in any way by use of Carter's Little Liver Pills, (3) whether or not use of Carter's pills would (also) produce a beneficial effect "in the treatment of conditions, disorders and diseases of the liver." (As to point 3 here noted see Commission's Order set out in footnote 5, supra.)

Our comment on the position of Counsel for Carter calls for a further comment on assertions in the Commission's brief. Stress is there laid on the contention that "the actual area of factual conflict relates simply and solely to what influence, if any, petitioner's laxative pill will have on the production and flow of bile." The Commission's brief also emphasizes this point in somewhat different manner in stating that in Carter's (later noted) specification of errors 1 through 8, it states that the Commission's findings are erroneous because of the alleged method and manner in which the Commission considered or failed to consider the testimony and other evidence relating to experiments and tests conducted by witnesses for the Commission and for Carter. (See our comment on this point in footnote 4, supra.) The Commission's brief asserts that this evidence was admitted into the record as being responsive to allegations in the complaint that Carter's statement as to the effect of its laxative pill on the production and flow of bile was false and misleading. It is urged that as a consequence, Carter's

In footnote 9, infra, we have set out the text of the Commission's findings 3, 4, 18, 19 and 20 and these five findings specifications must, therefore, relate to the Commission's findings that Carter's laxative pill will have no effect on the formation or flow of bile. As respects this argument the Commission's brief contends that this is borne out by the argument in Carter's brief that there is no substantial evidence to support a Commission's finding that Carter's pill will have no effect upon the formation or flow of bile, i.e., that use of Carter's pills will not increase the production and flow of bile.

The Commission's brief also emphasizes the fact that the finding that Carter's laxative pill will have no effect upon the formation or flow of bile is only one of the many findings of fact made by the Commission relating to the falsity of petitioner's statements as to the therapeutic value of its laxative pill. Additionally, it is asserted that "there is no evidence of any nature in the record that any doctor has ever prescribed petitioner's laxative pill for any purpose other than to produce an evacuation of the bowels."

Counsel for the Commission content themselves with the ultimate argument that the only issues raised by Carter on this review are: (1) whether the findings that petitioner's laxative pill will have no effect on the formation or flow of bile is supported by the greater weight of the evidence and (2) whether petitioner was denied a fair and impartial hearing in this proceeding.

It is our considered judgment that the Commission reached its final determinations as to what had been established as facts, by a reliance on a body of testimony and evidence which it firmly believed to be substantial. As we have indicated, it then had before it for consideration not only the briefs and final oral arguments of counsel in 1956, but also the many thousands of pages of the reporter's transcripts of the testimony in the two sets of hearings held before the Hearing Examiner, along with more than 2000 exhibits of a highly technical character. We cannot find any legitimate basis for charging the Commission with dereliction of duty because it kept the analytical comments appearing in its Decision and Opinion within what we regard as a reasonable compass.

The Opinion of the Commission contains an illuminating and enlightening survey of the evidence and testimony as finally viewed by the Commission. This document, along with the Commission's com-

are not repeated at this point in our summary of other findings.

The Commission found as a fact (without dispute on this point) that the quantitative formula for Carter's medicinal preparation is

> Podophyllum Resin U.S.P. 1/16 gr.
> Po. Purified Aloes 1/4 gr.

It also found as a fact that Podophyllum Resin, also known as podophyllin, is used as a laxative, purgative or drastic cathartic, and aloes is one of the irritant cathartics ranking with senna, rhubarb and cascara sagrada; that Carter's preparation serves to increase temporarily the motility of the large bowel by irritation and thus induces partial evacuation of the large intestine.

The Commission, inter alia, also found that in connection with the sales of its laxative pills, Carter had represented to the purchasing public that its said preparation (1) represents a fundamental principle of nature in self-treatment; (2) is a competent and effective treatment for "a sluggish liver"; (3) will "wake up the flow of bile," is "effective in making bile flow freely"; (4) will cause the proper flow of gastric juices, vital digestive juices and vital alkaline juices; (5) is based on the fundamental principle of the operation of the digestive system, will "help food digestion," "lessen food decay," regulate digestion and the digestive system; (6) restore regularity, is a cure and remedy and constitutes a competent and effective treatment for constipation; (7) will clear away the "dark clouds of listlessness and despondency" and "give one's personality a chance"; (8) will "keep up one's pep and vigor," "make one feel good and up to par again" and "keep one smiling and happy"; (9) will eliminate bad disposition and keep good dispositions "cheerful, happy and a regular thing"; (10) will help in more ways than one to make one feel better again fast and differently and will provide two-way relief; (11) follows nature's own order for regularity and so regulate the digestive process that if taken at night one will awaken feeling the way one wants to feel, "full of normal old-time pep and vigor," "alive," "alert," "cheerful," "peppy," "eager," "robust," "bright," "lively," "full of pep," "bounce," "energy," "springy," "snap," "go and vigor," "spry and chipper again," "perked up," "up on your toes," "up to snuff," "up to par again," "fit as a fiddle," "chipper as a chipmunk," "on top of the world," "up and up," "rarin' to go," ready to "jump out" or "roll out" of bed, "singing like a lark," "singing a song for the sheer joy of living," "fresh as a daisy," "glad to be alive," "ready for a big breakfast"; (12) will influence the flow of liver bile so that one can overeat and overindulge without any discomfort and if one has overeaten or overindulged it will overcome such discomforts and enable one to wake up, "roll out of bed," "rosy and bright," "clear-eyed and steady-nerved," "feeling just wonderful," "feeling like a million," free from that "blue-Monday feeling," "ready for a great big breakfast," "alert and ready for work"; (13) does not contain any strong medicine and is safe to use; (14) is a competent and effective treatment for the mental and physical disorders set forth in para-

ments on the evidence appearing in its findings of fact which are set out in its Decision, leaves no doubt in our minds that the Commission's final Decision (as averred in the Opinion) reflects the fact that its Decision represents "the result of its own exhaustive examination of the record."

It is also our conclusion from a careful appraisal of the entire record on this review that the Commission made and entered its final findings of fact and its final 1956 Decision, Opinion and Order based thereon, with a full understanding of the content and significance of the entire record in this case which was then before it. That the final oral arguments of counsel were made in May of 1956, and the Decision and Opinion of the Commission (which were entered in the first part of October 1956) bespeaks, if anything, a conscientious and painstaking examination and appraisal of the then record of monumental proportions before reaching the final conclusion announced in these two documents.

graph Seven of the complaint (see our summary of the allegations in this paragraph referred to supra in this opinion); (15) *will have therapeutic value in the treatment of disorders and diseases of the liver.*

Upon consideration of the entire record before it, the Commission further found that the advertising representations of Carter, as just above summarized, were false and misleading in material respects. It also specifically found that through advertising which used the word "Liver" in the name "Carter's Little Liver Pills," Carter thereby represented that its preparation would have some therapeutic action, effect and influence on the liver, and is for use in the treatment of conditions, disorders, and diseases of the liver, and that such a representation was false and misleading.

The Commission's finding as to the false and deceptive character of the advertising representations made by Carter was based on its further findings that "Inasmuch as the laxation afforded by an irritant laxative or cathartic is not a normal physiological method of evacuation and is not based on any principle having relation to natural bowel motility, it is not true that the preparation represents a fundamental principle of nature in self-treatment." This finding in turn was based on the evidence of a witness supporting the Commission's complaint, and of several doctors who testified for Carter.

The Commission also found that "In a scientific sense, constipation is a term used to connote a slower rate of evacuation of the large bowel than the one normal for that individual. Although it has reference to delay in the passage of indigestible residues through the alimentary tract and to infrequency of bowel action, and may be used to describe the condition in which the stools are dry and hard, constipation has been described also as being that condition which causes a person to believe that a cathartic is necessary to cause a bowel movement. Normal frequency in bowel movement

varies widely among individuals. Because varied notions obtain with respect to what represents normal frequency, the average layman may not diagnose constipation properly and there is a tendency for self-diagnosis to be made on the basis of symptoms having no relationship to constipation. In its chronic form, there are two general types of constipation: (1) spastic, and (2) atonic. The state of the musculature of the large bowel differs in the two conditions named. In the spastic variety, the musculature is abnormally contracted and rigid and does not propel the contents thereof forward in a normal manner. In the atonic condition usually associated with an enlargement of the large bowel due to tremendously increased content, the musculature does not contract and retain its tonus or state of partial contraction. Atonic constipation is attributable to constitutional weakness of the muscles of the colon and is supposed to occur principally in the rectum, while the spastic type is supposed to be due principally to anxiety, worry, or nervous strain. Among the causes of constipation or irregularity of bowel movement are improper diet and stool habits, insufficient intake of fluids and variations or obstructions of the alimentary tract such as fissure, cancer and debilitating conditions. Factors predisposing to constipation are numerous and thorough study by the physician is necessary before comprehensive treatment is undertaken. Its treatment, therefore, varies in individual cases, but is directed to correcting the basic conditions which are responsible." (As to the fundamental propositions noted in this finding, the several doctors who testified appear to be in agreement.)

The Commission further found that with regard to the type of constipation known as spastic, Carter's Little Liver Pills "will tend to aggravate any state of spasticity which is present." The Commission also found on undisputed evidence that the habitual use of irritant laxatives and cathartics tends to produce irregularity rather than to restore regu-

larity and the use of Carter's preparation will not restore regularity of bowel movement.

The Commission also found (without dispute) that the statements appearing in Carter's advertising to the effect that its product is composed of two simple vegetable medicines and the references therein to "gentle action purportedly afforded by its use" imply that Carter's Little Liver Pills do not contain strong medicines.

The Commission found (and we think correctly) that Carter's pills do contain "strong medicines." The Commission declares, and the record shows, that though the ingredients of these pills are obtained by purification of members of the plant kingdom, their ingredients are "irritant purgatives." This record also provides substantial evidence that aloes taken in sufficient amounts leads to some hyperemia and increased vascularity; that neither aloes nor podophyllin is absorbed to any great extent, and as long as they remain in the colon may be causative of local irritation. It also found (in the first series of hearings) that podophyllin was removed from the U. S. Pharmacopoeia when the scientific group responsible for the preparation of this publication recognized it as a "drastic," or member of that class of irritant drug which includes colocynth and jalap.

The Commission also found (without dispute) that Carter's product is not safe for and harmless to all individuals who are constipated or suffering from delay or irregularity of bowel movement and symptoms thereof, or from failure of digestion. It also found (without dispute) that Carter's pills are potentially injurious if taken by persons suffering from abdominal pains, nausea, vomiting, or other symptoms of appendicitis. It further found (without dispute) that

use of Carter's pills may cause perforation of the intestine in instances where delay in the evacuation is due to obstruction in the tract. (It was emphasized in the evidence that in some instances the use of Carter's pills may be attended with griping and stomach discomfort, and when used in the presence of constipation of the *spastic* type may serve to increase and aggravate such state of spasticity.)

The Commission also found, and the evidence is uncontradicted, that use of a laxative is contraindicated in many conditions.

It also found specifically that the ingredients in Carter's pills, alone or in combination of one with the other, will have no therapeutic action, effect, or influence, corrective or otherwise, on the liver. This finding rests upon the testimony of three experts whose testimony supported the allegations of the Commission's complaint.

The Commission also found that the greater weight of the testimony and other evidence introduced in the record supports informed determinations that Carter's preparation will not stimulate the formation of bile by the liver or increase the secretion of bile by the liver.

It also found, inter alia, that Carter's preparation will not increase the flow of bile or any constituents thereof into the duodenum—also that Carter's preparation is not an effective treatment for sluggish liver function and will have no therapeutic action on the liver or diseases thereof; that it will not wake up the flow of bile or cause bile to flow freely, or favorably influence the formation or flow of bile either as to quantity or the vital and effective constituents thereof; (As pointed out in footnote 7, supra, the vital controversy in this case centers in this area.[8]) that this preparation does

8. Certain of the Commission's expert medical witnesses testified that Carter's laxative preparation would have no influence on bile flow.

Certain of Carter's expert witnesses differed somewhat in their views on this particular problem; one expert medical

witness testified on direct examination that Carter's laxative pill would effect bile flow; one of such witnesses said that his experiments would not permit a conclusion and a third medical expert (characterized by Carter in its brief as its "key witness") said that Carter's pill

not provide two-way relief and has no therapeutic effect beyond that of an ordinary laxative, that is to say, of any substance which increases the movements of the large bowel either through irritation, bulk or fluid content; that it will not influence the production or flow of liver bile so that an individual can overeat and overindulge in "good times" without such discomforts as may normally attend them, nor enable an individual to wake up "clear-eyed and steady-nerved," "feeling just wonderful," and "alert and ready for work"; that Carter's preparation has no chemical action on food which will prevent decay thereof, and the representation that it will lessen food decay is misleading.

It also found that use of Carter's product will not increase the effectiveness of the gastric juices or cause the proper flow of any of the vital digestive juices, and it will not help digestion or regulate the digestive system or diges-tion, or have any salutary effect upon the gastro-intestinal tract aside from affording temporary partial evacuation of the colon; that to the contrary, in some instances, use of Carter's pills may interfere with and disturb digestion.

The Commission went further and found that when certain conditions exist that are associated with constipation, Carter's pills do not constitute a competent and effective treatment for such manifestations (referred to in finding No. 4—see footnote 9 infra) when they are associated with or caused by constipation; that Carter's preparation is not an effective treatment for indigestion, or "lazy digestion" or retarded digestion in any circumstances in which such conditions may occur.

Based upon its consideration of the evidence as a whole, and its appraisal of the weight to be given the probative value of all of the evidence and testimony adduced in the many hearings over the

would increase bile flow if three conditions were present at the same time.

The "three conditions" mentioned by this third witness were as follows: (1) Carter's pill must be taken in sufficient doses over a sufficient period of time to "produce laxation either within normal limits of fresh weight stools or the maximum effect." This witness stated that to accomplish this, 5 of Carter's pills must be taken every day for 1 week. He admitted that what is a normal limit of fresh weight stools varies in the individual from time to time. He stated that he was not willing to say if a person met this requirement that it would mean the flow of bile would be increased. (2) As to the second "condition," this witness stated that "the rate of flow of bile into the duodenum will be increased in individuals and, only in individuals who show during periods within which they have been taking no [Carter's laxative] pill 'low values' for the biliary constituents in the duodenal fluid in response to a stimulus introduced into the duodenum of the type of Peptone."

As to the way this (second) condition could be met, the expert admitted that unless the purchaser of Carter's pills had had a duodenal drainage performed, he would not know whether such drainage was high or low and unless he did know, he would not be in a position to tell whether Carter's pill would have any ef-fect upon the flow of bile. Again, this witness was not willing to say that even though this second condition was met together with his other "conditions," Carter's laxative pill would secure an increase in bile flow.

The third condition was that Carter's pill will increase the flow of bile "in individuals who show signs, during periods in which they are not taking Carter's pills, of diminished rates of intestinal motility as indicated by abnormally low fresh weight stools and symptoms depending upon the abnormally low rate of intestinal motility."

Counsel for the Commission finds this testimony concerning the third condition to be "difficult of interpretation" and points out that Carter's witness interprets it to mean "that the individual be one who shows signs when not taking the pills of low or diminished rates of intestinal motility as indicated by abnormally small stools or absence of stools."

On cross-examination, this "key witness" of Carter was asked whether, if these "three conditions" he had named were met, he was willing to state that whenever anyone takes Carter's Little Liver Pills (under these three conditions) the level of the flow of the biliary constituents into the duodenum would be raised. The witness replied that he was not willing to make such a statement.

years, the Commission also found, inter alia, that evidence introduced in support of the complaint, particularly when considered in connection with the results afforded by certain of the scientific experiments, constitutes a full refutation of the scientific view by witnesses for Carter to the effect that "a favorable influence on bile flow may result from the increased intestinal motility afforded by the irritating action of a laxative" of the Carter type. It also found that "not only is it apparent that the augmented intestinal motility through this (Carter) type of laxative affords bowel evacuation does not significantly increase bile flow, but the greater weight of the scientific evidence received shows that there is no causal relationship between constipation and bile flow"—that "this conclusion has support in other scientific evidence indicating that constipation will not, under any circumstances, decrease bile in the system to such an extent that there is not sufficient bile to carry on its function in the digestive process."

The Commission further reached and expressed the factual conclusion and opinion on the entire record before it, "that the greater weight of the testimony and other evidence introduced into the record supports informed determinations that the preparation Carter's Little Liver Pills will not stimulate the formation of bile by the liver or increase the secretion of bile by the liver"; that "inasmuch as the evidence further shows that the respondent's product will not cause the gall bladder to contract or cause relaxation of the sphincter of Oddi or prevent its contraction in the first instance or serve in any way to milk bile from the ampula of Vater or the bile duct, the Commission further concludes that the respondent's preparation will not increase the flow of bile or any constituents thereof into the duodenum."

In Paragraph 12 of the Findings the Commission found that "Counsel sup-

porting the complaint maintains that the evidence relating to the test studies submitted in support of the complaint conclusively establishes that Carter's Little Liver Pills do not act in any way to increase the secretion or flow of bile. In contending that the greater weight of the evidence fully supports determinations to the contrary, counsel for the respondent asserts that the record shows that a relationship exists between constipation and bile flow in that a large number of people who suffer from constipation also have a subnormal flow of bile; and that, concomitant with the laxation afforded them and the relief of their associated symptoms, the (Carter) preparation causes significant increases in the levels of biliary constituents for these individuals. *Each counsel contends in effect that the scientific evidence presented by his adversary is based on defective experimental procedures and reflects erroneous interpretations of those studies and unsound expressions of medical opinion."* [Emphasis supplied.] See our comments in footnote 4, supra, concerning these "experimental procedures." (See reference in footnote 9 to text of Commission's Finding No. 19 in which it dismisses certain charges in its Complaint.)

### The Four Controlling Findings

Four of the Commission's final findings of fact here noted require special emphasis by us, this for the reason that they clearly indicate that the Commission finally elected to support the injunctive provisions of its Cease and Desist Order of October 4, 1956 (footnote 5) by an ultimate reliance on the facts which the Commission, in and by these particular findings, determined had been fully and finally established by a body of evidence of a substantial character. In the margin we set out the text of the four crucial findings of fact here referred to.[9] The language of Finding No. 20 serves to further clearly identify the

---

9. Finding No. 3 reads as follows:
"In furtherance of the sale and distribution of the aforesaid medicinal preparation, the respondent has disseminated, and has caused the dissemination of, advertisements concerning said preparation

particular advertising representations employed by Carter in the sale of its product (which the Commission ultimately condemned as false and misleading) these including the advertising representations carefully described in Findings Nos. 4 and 18. (Among these false and misleading advertisements is the use

by the United States mails and various means in commerce, as 'commerce' is defined in the Federal Trade Commission Act; and the respondent has disseminated, and has caused the dissemination of, advertisements concerning such preparation by various means for the purpose of inducing, and which have been likely to induce, directly or indirectly, the purchase thereof in commerce, as 'commerce' is defined in the Federal Trade Commission Act."

Finding No. 4 reads as follows:

"All the representations hereinafter referred to have been made directly or by implication in advertising material which the respondent has disseminated or caused to be disseminated in the manner noted in the preceding paragraph. [The preceding paragraph is Finding No. 3.]

"(a) Through use of words, phrases, and statements purporting to be descriptive of the therapeutic value, beneficial effects and advantages afforded by use of the preparation 'Carter's Little Liver Pills,' the respondent has represented, directly and by implication, among other things, that its product represents a fundamental principle of nature in self-treatment, that it is a cure and remedy and constitutes a competent and effective treatment for constipation, and will bring on, help, and restore regularity of bowel movement.

"The respondent also has represented that its preparation does not contain any strong medicine, and that it is harmless and safe for use by those individuals who have constipation or are experiencing delay in bowel movement or in whom a failure to digest food has occurred.

"(b) The respondent similarly has represented that the preparation is a competent and effective treatment for sluggish liver function, liver ills, and disorders affecting the liver; that its use will 'wake up the flow of bile,' will make 'bile flow freely' by getting the liver back to normal and back to producing; that its use will so influence the production or flow of liver bile that one can overeat and overindulge in 'good times' without the ordinary discomforts resulting therefrom; that if one has overeaten and overindulged in 'good times' that the preparation 'Carter's Little Liver Pills,' by its influence on the production or flow of liver bile, will overcome the discomforts that usually and ordinarily follow

such indiscretions and will enable the user to wake up 'clear-eyed and steady-nerved,' 'feeling just wonderful,' and 'alert and ready for work'; that such preparation through its favorable influence on bile flow and in helping to restore regularity provides two-way relief, and that it is not an ordinary laxative but possesses therapeutic properties over and above and in addition to its laxative action.

"(c) The respondent's advertising also has contained statements representing that use of its preparation will cause the proper flow of the gastric juices and natural vital digestive juices; that it will lessen food decay and is based on the fundamental principle of the operation of the digestive system; that such preparation will help food digestion, including the stopping of fatty indigestion, and will regulate digestion and the digestive system; and that it so follows nature's own order for regularity and so regulates digestion that it will make the user 'fit as a fiddle,' and full of 'bounce.'

"The respondent further has represented that constipation poisons the body.

"(d) Through the use of colloquial words and phrases, which purport to be descriptive of various physical and mental conditions, the respondent has represented, directly and by implication, among other things, that when caused by constipation or irregularity of bowel movement, the preparation designated 'Carter's Little Liver Pills' is a competent and effective treatment for those conditions in which an individual feels: 'Down-and-out,' 'blue,' 'down-in-the-dumps,' 'worn out,' 'sunk,' 'logy,' 'depressed,' 'headachy,' 'sluggish,' 'all-in,' 'listless,' 'mean,' 'low,' 'cross,' 'tired,' 'stuffy,' 'heavy,' 'miserable,' 'sour,' 'grouchy,' 'bilious,' 'irritable,' 'cranky,' 'peevish,' 'fagged out,' 'dull,' 'sullen,' 'what's-the-use,' 'bogged down,' 'grumpy,' 'run-down,' and 'gloomy.'

"The respondent similarly has represented that its product is a competent and effective treatment for headache, ugly complexion, bad breath, coated tongue, bad taste in the mouth, 'lazy digestion,' and 'indigestion,' when caused by constipation."

Finding No. 18 reads as follows:

"Through use of the word 'Liver' in the name 'Carter's Little Liver Pills' which is featured in the advertising, the respondent represents, directly and by im-

of the word "Liver" in the name "Carter's Little Liver Pills.") Finding No. 3 describes these advertising representations as having been disseminated in commerce.

Since the Commission saw fit in these four findings to specify the ultimate basis for its Order here assailed by Carter, we think that by this action the Commission has materially narrowed our task in reviewing the record. As we view the problem now before us, it is whether the record of evidence and testimony, taken as a whole, presents a body of evidence of a substantial character which provides support for these particular findings of fact. If so, they must be sustained.

In appraising the entire record we were at pains to examine the testimony of the array of witnesses produced by the parties. In so doing we noted the weight which the Commission saw fit to give the various conflicts in the testimony of the several witnesses for both sides as well as to the points of agreement developed in their testimony, a fact to which we have previously adverted. And we think that in view of the great length of this record (including the exhibits) and the complexities enshrined in its mass of highly technical testimony from experts, the Commission is not to be criticized for refraining from engaging in a lengthy recital and appraisal of every facet of this extensive

plication, that the preparation 'Carter's Little Liver Pills' would have some therapeutic action, effect, and influence on the liver, and is for use in the treatment of conditions, disorders, and diseases of the liver. Said representations are false and misleading. The ingredients in the preparation 'Carter's Little Liver Pills,' alone or in any combination of one with the other, will have no therapeutic action, effect, or influence, corrective or otherwise, on the liver. The preparation will have no therapeutic value in the treatment of any condition, disorder, or disease of the liver or the biliary system. Upon consideration of the remedy which should be applied in this connection, the Commission is of the opinion that only excision of the word 'Liver' from the product name will serve to eliminate the deception engendered by its use."

Finding No. 20 reads as follows:

"The Commission, therefore, finds that *the representations appearing in the advertising* for the preparation 'Carter's Little Liver Pills,' *as set forth in Paragraph Four and Paragraph Eighteen hereof*, are misleading in material respects, and that the advertisements *thus disseminated by the respondent Carter Products, Inc.*, constitute 'false advertisements,' as that term is defined in the Federal Trade Commission Act. *The use of such representations and of the word 'Liver'* in the name 'Carter's Little Liver Pills', by the respondent has had, and now has, the tendency and capacity to mislead and deceive a substantial portion of the purchasing public into the erroneous and mistaken belief that *all such statements and representations* are true, and to induce a substantial portion of the

purchasing public, because of such erroneous and mistaken belief to purchase the respondent's preparation." (Emphasis is ours.)

In addition to the Commission's "four controlling findings" above referred to, the Commission made Finding No. 19 which is favorable to Carter. This particular finding reads as follows:

"(a) The complaint charges also that the respondent's advertisements constitute false advertisements for the further reason that they *fail to reveal certain facts* as to potential dangers inherent in the use of such preparation under conditions described in the advertisements or conditions as are customary and usual by persons suffering from abdominal pains, nausea, vomiting, or other symptoms of appendicitis. The Commission is unable to find, however, that the potential danger to the public health inherent in the use of the respondent's preparation is so serious as to require a disclosure in the advertising of the matters to which this charge relates and, in the circumstances, is of the opinion that dismissal of such charge without prejudice is warranted.

"(b) Additional allegations of the complaint charge that the respondent has falsely represented that calomel is a drastic and dangerous laxative compound, the use of which is an ordeal. Although testimony was introduced into the record directed to showing, among other things, that calomel, when taken in proper doses, would not be painful, it is not believed that the charges are supported by the record, and they are, accordingly, dismissed."

testimony, as buttressed by the exhibits. From our consideration of the record we are fully persuaded that the Commission did carefully and conscientiously consider and appraise the probative force of the entire body of testimony and evidence before entering the Order here assailed. In our judgment its final pronouncements in its decision and formal opinion bear witness to that sort of treatment.

When Carter made the representations as to the therapeutic qualities and effect of its pills in the advertising claims particularly described in Findings Nos. 4 and 18, it was therein making statements of fact, and the truth or lack of truth in these representations presented an issue of fact to the Commission. Carter has vigorously assailed the Commission for referring to the "inconclusive" and/or "impersuasive" character of certain phases of the testimony presented by it, and charges that the record shows that this kind of a conclusion was the result of faulty evaluation of the evidence. The burden of proof was on the Commission, and its legitimate administrative task was to primarily determine, as it did, whether the probative weight of the proof submitted in Carter's defense served adequately to rebut the proof presented by witnesses supporting the Commission's complaint. Whether Carter's evidence was sufficient in this respect presented a question of fact primarily for the Commission to decide from the entire record. The duty of the Commission was to weigh all of the evidence before it, and in so doing to determine therefrom whether *all or any part* of this evidence was convincing in its probative weight or was so inconclusive or unconvincing as to lack the probative weight necessary to carry conviction of its truth. We think that in expressing its determination as to the proper weight to be given the entire body of evidence, the Commission did not err in employing our common vernacular to describe the defi-

nite impression this evidence established in the minds of members of the Commission.

As a final comment on the four crucial findings here mentioned, it should be noted that so far as concerns Carter's farreaching advertising claims in evidence, the record clearly indicates that the several claims described in Findings Nos. 4 and 18 are fairly typical of, and embrace many of the aggregate of Carter's advertising claims as to the therapeutic qualities of its product, all as set forth and described in several other findings of fact entered by the Commission which are supported by substantial evidence. We think that the evidence introduced to show that the claims described in Findings Nos. 4 and 18 had been made in Carter's extensive advertising, was most substantial in character. Our conclusion is that by Findings 4, 18 and 20 the Commission made plain that in the last analysis it elected to rest its injunctive Order of 1956 on Carter's use of the particular advertising claims so carefully identified in these critical findings.

### Carter's Specification of Errors

On this review on the merits, Carter's Specification presents twelve claims of error on the part of the Commission. It accompanies these claims with a brief preliminary comment charging that *the record itself* demonstrates that the Commission committed *all* of the errors relied on in this Specification, and that the Commission's proof does not in fact or in law constitute substantial evidence including conviction sufficient to warrant the issuance of the Commission's Order.

Before reaching Carter's Specification and the supporting argument in the briefs, we note the fact that Carter (also) supports the said claims of error by reference to, and adoption of, its formal "Petition to Review and set aside the Commission's Order" and its "Petitioner's statement of Points." In the margin we note some of the salient points

raised in these documents.[10] These points are keyed to the general arguments in Carter's briefs in support of its formal Specification of Errors.

Carter's claims of error are supported in two briefs containing 215 pages of argument and citation of approximately 206 cases thought to be pertinent to the

10. In its "Petition to Review" here noted, Carter, inter alia, complains that on March 3, 1955, the Hearing Examiner entered his order closing the case; that Carter then moved the Commission to disqualify this hearing officer and terminate the entire proceedings; that before the Commission could decide this motion, the said officer filed his Supplemental Report with respect to the proceedings on remand from this court and recommended the issuance by the Commission of the Cease and Desist Order now before this court; that on September 20, 1955, the Commission denied Carter's motion to disqualify the said Hearing Officer and also refused to grant the relief sought in Carter's said motion; that an appeal was taken on November 29, 1955 to the Commission from the rulings and Supplemental Report of the Hearing Examiner on which the motion to disqualify him was rested; that the Commission thereafter issued its Cease and Desist Order of October 4, 1956 which is now before us.

In summary, the grounds for relief asserted by Carter in its said "Petition to Review" are as follows:

The Commission's said Cease and Desist Order, and its aforesaid order of September 20, 1955, along with the Decision and findings of fact "are erroneous in law and fact, not supported by the evidence, or by any probative evidence or by substantial evidence;" are contrary to the evidence and the weight of the evidence; are violative and in excess of the Commission's statutory and jurisdictional powers; are violative of Carter's constitutional rights; are contrary to the Federal Administrative Procedure Act; are not in the public interest and are (also) contrary to the mandate of this court heretofore issued; that the aforesaid Cease and Desist Order of the Commission and its denial of the aforesaid motion of Carter are (also) based upon the failure of the Hearing Officer and the Commission "to weigh, consider or receive the competent, material and relevant evidence offered or adduced in these proceedings."

Carter further complains therein that the Commission did not pass "properly" upon its exceptions and proposed findings of fact and conclusions of law; that as a consequence Carter was deprived of due process and a fair and impartial trial

on the entire record made in both sets of hearings.

Petitioner's "Statement of Points" contains a vigorous attack upon the validity of the proof tendered by the Commission's witnesses, and the Decision and Opinion of the Commission resting on this proof. It is urged that the said Decision and Opinion are "irresponsive" to Carter's claims; are contrary to the evidence and weight of evidence, and are not supported by reliable, "convincing," probative or substantial evidence or such evidence "as a reasonable mind might accept as adequate to support a conclusion," or as would "logically and rationally permit findings to be made," and are not supported by proof of (and contrary to) the consensus or general agreement of qualified medical opinion. In short, the charge of Carter in his pleading is that the Commission's findings of fact, its Decision and Opinion are, on their face, and inherently, self-destructive and self-contradictory of each other, and on their face, demonstrate the Commission's failure to sustain its burden of proof and convincingly show that the Commission "has never weighed, considered or passed upon this record" in accordance with the letter and the spirit of the mandate of this Court.

It is further urged in these "Points" that the Commission has not subjected the record to "any proper scrutiny at all" in that it failed to pass separately, fairly and carefully upon all of Carter's original and supplementary exceptions and proposed findings.

Carter's "Statement of Points" is lengthy, and is set forth in nineteen paragraphs. It is in the main a vigorous frontal attack on the testimony and proof tendered by witnesses supporting the Commission's complaint. It challenges the validity of the proof dealing with so-called "experimental proof" and the opinion evidence given by the Commission's witnesses in connection therewith. It likewise asserts that the testimony of the Commission's witnesses did not constitute proof by "general medical agreement" or "consensus of medical opinion"—that proof that Carter's "honest, harmless therapeutic claims" were false was not established as required in this type of conflict.

It is obvious that the above noted reference to the "honest, harmless therapeutic

issues presented in this review. Statutes and text matter are also cited as authority. We set out in the margin the text of the *first six claims* of Carter's Specification of Errors.[11]

Carter's arguments supporting these six claims emphasizes, and to a marked degree appears to be predicated upon, the assumption that the Commission's final (1956) administrative findings of ultimate probative facts in this case are fatally tainted and should and must be rejected on this review as invalid because *portions* (or possibly *all*) of the actual testimony of some of the Commission's witnesses was (to quote Carter) "unreported in its findings," that is to say, such testimony was not set out verbatim in the Commission's findings of fact. If it be Carter's theory that in order to be valid and be tolerated in this court the Commission's findings of fact should repeat part, or all, of such testimony, we must and do reject such a theory as lacking validity under established practice in our system of law. And it should be added that our attention has not been drawn to any responsible authority which gives sanction to such a theory concerning the fact-finding functions of an administrative tribunal like the Commission.

We summarize in the margin [12] the remaining six claims of error asserted by Carter.

claims" of Carter is a comment upon the many claims asserted in the advertising material disseminated by Carter.

11. "(1) the Commission's findings disregard the testimony and express admissions (unreported in its findings) of its *own* witnesses that their abnormal surgically performed test methods, employed primarily on *animals,* either changed entirely the physical conditions or did not reproduce conditions which could be properly compared to the normal conditions of use of Petitioner's product;

"(2) the Commission's findings disregard the testimony and ignore express admissions (unreported in its findings) of its *own* witnesses that the protocols of *all* their tests, whether upon animals *or* humans, were patently and fatally faulty in design and their tests themselves both fatally defective and irresponsive to Petitioner's claims;

"(3) the Commission's findings disregard the testimony and ignore express admissions (unreported in its findings) of its *own* witnesses (destructive of their test procedures), that *dosages* of various drugs or the same drugs in animal and man are not comparable and introduce a disturbing variable which renders the Commission's evidence unsubstantial;

"(4) the Commission's findings disregard and ignore testimony and express admissions (unreported in its findings) of its *own* witnesses that under the 'abnormal condition of the experimentees' the reactions of man and animal to the same or similar drugs are not identical or substantially identical and require to be supplemented by experimentation on representative groups of normal human beings;

"(5) the Commission's findings disregard and ignore the testimony and express admissions of its *own* witnesses (not reported in its findings) that because of the concededly delayed reaction time of the drugs tested, the Commission's experiments were on their face prolonged for an insufficient length of time to constitute substantial evidence inducing conviction that those drugs do not possess the effects claimed by Petitioner;

"(6) the Commission's findings disregard and ignore the testimony and express admissions by its *own* witnesses (not reported in its findings) that their liver function tests performed on animals are not translatable to man;"

12. The Commission's findings (1) are mutually self-destructive and self-contradictory because the very same defects which they impute to Carter's experiments in order to disqualify those experiments "by the same token destroy the Commission's own experiments," thus, on their face they demonstrate that the experiments of the Commission's witnesses "cannot possibly constitute substantial evidence inducing conviction"; (2) the findings are based on an erroneous and illegal standard of proof imposed on Carter alone, namely, that its proof be conclusive, thus applying a dual standard of proof, one for its own and another for Carter; (3) the findings (a) were arrived at by "ignoring the spirit and purpose" of this court's remand by excluding proper offers of proof, by prejudiciously restricting, through its Examiner, the cross-examination of Commission's witnesses designed to test the experiments of these witnesses, and by erroneously restricting Carter's examination of its own expert

490

Before leaving the subject of Carter's claims of error, we point out that after our remand, the cross-examination of Commission witnesses Doctors Case and Bollman was resumed (on the 146th hearing in this prolonged litigation which had then spawned a transcript of record containing approximately 13,000 pages). This appears from a statement by the Hearing Examiner. See also footnote 15, infra. The cross-examination of both of these witnesses was searching and extensive. Including a re-direct examination by Commission counsel, this part of the record occupies about 300 pages of the printed transcript now before us. A reading of this segment of the huge record induces our belief that Carter's questions on cross-examination after the remand reached into every material phase of the crucial issues present in this case, including a re-examination by Carter of certain views and opinions expressed by these two Commission witnesses in the testimony they had given in the prior series of hearings.

As to the breadth of allowable cross-examination here referred to, the Hearing Examiner stated to counsel in the case that he was "going to give the respondent (Carter) as full leeway as I possibly can irrespective of any objection of the attorney in support of the complaint," this so that counsel might "pursue this cross-examination until he can go no further." At the conclusion of the testimony of Dr. Case, counsel for Carter was asked by the Hearing Examiner if he was satisfied that he had been given ample opportunity to cross-examine this witness, and counsel then stated that he had asked all of the questions he wanted to ask.

At the conclusion of all of the testimony of Dr. Bollman, counsel for Carter stated that he had no further questions.

 Bollman was extensively questioned by Carter's counsel as to the *method* he employed in conducting his animal experiments. He was asked to compare his views and supporting data with certain views he had previously expressed, and to justify his views in light of conflicting views expressed by Carter's witnesses and certain other experts. The cross-examination was so thorough and searching that it would be difficult to envision a more complete exploration of professional opinion dealing with a highly technical subject upon which differences of opinion had been developed. In any event, whether Bollman used a *correct method* in experimentation was a

witnesses for the purpose of explaining or amplifying their experiments; (b) are based upon the misconduct of these proceedings by an Examiner whose bias and prejudgment of the issues have now been demonstrated beyond question, and show that the Commission shared the prejudgment and failed to make a fair estimate of the worth of the testimony; (c) were based on its reversible error in denying Carter's motion to disqualify the Examiner and (d) establish beyond question that the Commission has again denied Carter due process of law; (4) that the issues involve a medical field— the liver and biliary system—which is one of the most problematical, controversial and highly unsettled frontiers in the whole realm of medicine and where due process demanded of the Commission, before snuffing out Carter's huge investment and property in this product, particularly high and exacting methods of modern and up-to-date scientific proof and an evaluation based on a disinterested inquiry in the spirit of science; (5) the defects in the Commission's proof are so gross and its misjudgment of that proof so great that it is unnecessary to review Carter's evidence presented in defense, because there has been so clear and so glaring a failure on the part of the Commission to sustain its affirmative burden of proof, and because the Commission made a wholly erroneous disposition of that evidence throughout its Findings which deprived Carter of due process; (6) that however the evidence is viewed, impelling and important constitutional considerations, involving novel questions of law, preclude the issuance in this case of any cease and desist order at all.

In presenting the six claims of error just above noted, Carter assails the Commission's findings because they did not contain an "express finding" that Carter's experimental proof does not constitute substantial evidence, the findings only stating that such proof was "not conclusive."

factual question for decision by the Commission when it weighed the evidence. See our comments in 201 F.2d 446, 449, 450.

Under the decisions later noted it will not be contended that it is the duty of this Court to weigh the evidence before the Commission and/or choose between inferences which might arise from an appraisal of the probative worth of this evidence, since exercising those important functions became the primary duty of the Commission. We agree with Commission counsel that it was for the Hearing Examiner and the Commission, not the Courts, to pass upon the credibility of witnesses and the weight to be accorded their testimony. See decision of this Court in Tractor Training Service v. Federal Trade Commission, 9 Cir., 227 F.2d 420, 424. See also Corn Products Refining Co. v. Federal Trade Commission, 324 U.S. 726, 739, 65 S.Ct. 961, 89 L.Ed. 1320. Many decisions of like purport fully support this well established rule. So much may also be said concerning the *weight* to be given by the Commission to the facts and circumstances admitted as well as inferences reasonably to be drawn therefrom. The possibility of drawing either of two inconsistent inferences from the evidence does not prevent the Commission from drawing one of them.

The overwhelming mass of evidence and testimony in this case dealt almost exclusively with not only highly technical problems in the field of medicine, but also with what we regard as pure questions of fact—(1) what therapeutic action, effect or influence, if any, would the use of Carter's preparation have upon the human liver or diseases thereof, (2) would use of Carter's preparation stimulate the formation of bile by the liver or increase the secretion of bile by the liver, (3) what therapeutic effects, if any, followed the use of Carter's preparation when employed by human beings for the purpose of securing satisfactory relief from the array of human ills and achieving the many physical benefits so vividly described and promised in Carter's widely diffused advertising?

We are quite convinced that answers to such technical questions in the field of medicine could come only from medical experts. Their testimonial conclusions and opinions as to the effect upon the human system arising from the use of Carter's preparation had to rest upon and derive from their "experiments" (later referred to); their knowledge of the character and therapeutic qualities of the two drugs used in Carter's preparation; their own practical professional experience, and upon medical texts and technical opinions of other medical experts which appear to have found their way into the testimony. Confronting the record as a whole, including the testimony from all medical experts, the Commission faced the duty of concluding and determining from this body of evidence just what medical facts had been established as true by evidence of a substantial character.

As to the experiments above referred to, Commission finding No. 11 makes plain that expert witnesses for *both sides* had extensively experimented upon anesthetized dogs and human beings to demonstrate the results on these animals from use of the drugs employed in Carter's pills, or from use of drugs possessing similar characteristics. The elaborate testimony of these witnesses, with supporting data, was received in evidence to support the basic contentions of both parties as to results achieved from such experiments. In its Finding No. 12 the Commission was at pains to find that "each counsel contends in effect that the scientific evidence presented by his adversary is based on defective experimental procedures and reflects erroneous interpretations of those studies and unsound expressions of medical opinion." The lengthy comments of the Commission in its findings dealing with the testimony of expert witnesses concerning results of their experiments on dogs and human beings convinces us that this phase of the evidence and testimony was

given a searching and conscientious study by the Commission before it made its final findings of fact. (See our comments in footnote 4, supra, concerning our first opinion which dealt with admissibility of evidence and testimony relating to such experiments.)

In its attack on the substantiality of the Commission's evidence, Carter vigorously argues that the testimony of the expert witnesses presents a conflict of general informed medical opinion on basic medical issues; that this conflict is so substantial "as to compel enforcement by this Court of the standard of certainty in the proof of the falsity of a harmless, honest therapeutic claim prescribed by the Legislature in enacting the Walter-Lea amendments to the Federal Trade Commission Act and by the Federal Constitution."

Parenthetically, we point out that we disagree with Carter's contention concerning the effect of these amendments.

Our careful examination of the record demonstrates to us that the issue concerning "general informed medical opinion on basic medical issues," was not only a subject of comment appearing in various professional opinions tendered by Carter's expert medical witnesses, but their opinions on this subject were countered by conflicting views expressed by Commission witnesses. From the tenor and purport of testimony offered by Carter's witnesses it is clear that such testimony was introduced to demonstrate the existence or non-existence of a substantial fact, i. e., whether there existed a "consensus of informed medical opinion" which sustained the validity of Carter's advertising claims concerning the many therapeutic virtues of its medicinal preparation.

Carter's position seems to be that this court should now proceed to weigh all of the evidence on this particular issue and decide just what this evidence had proved, or failed to prove concerning the existence of some sort of a body of "informed medical opinion" as to the therapeutic worth of Carter's product. We disagree. In our view the testimony presented a fact issue which, in any event, would have to be primarily resolved by the Commission in light of all of the expert testimony on the subject. Whatever might be our personal judgment concerning the probative worth of a huge mass of medical testimony which tended to prove or disprove the existence of such a body of "medical opinion," our views would have to yield to the specialized experience and knowledge of the Commission. The judges of this court are not equipped by education, training or experience to resolve a factual question of this character which obviously concerns the accuracy of the respective scientific views of men who are practicing the art of medicine. The futility of an attempt by a reviewing court to exercise such a function becomes all the more obvious in face of the fact that medical experts have reached different conclusions on this issue. (See footnote 15, infra.)

## Part Two

The reports contain a host of decisions dealing with the scope of judicial review of orders of federal administrative agencies, and an imposing array of them deal with decisions of the Federal Trade Commission. It is unnecessary to analyze the holdings in many of the apposite decisions [13] since a comparatively few of them serve to provide a satisfactory answer to the basic review problem

---

13. Federal Trade Commission v. Pacific States Paper Trade Association, 273 U.S. 52, 63, 47 S.Ct. 255, 71 L.Ed. 534; Corn Products Refining Co. v. Federal Trade Commission, 324 U.S. 726, 739, 65 S.Ct. 961, 89 L.Ed. 1320; Jacob Siegel Co. v. Federal Trade Commission, 327 U.S. 608, 612, 613, 66 S.Ct. 758, 90 L.Ed. 888; American Power & Light Co. v. Securities and Exchange Commission, 329 U.S. 90, 103, 106, 115, 116, 67 S.Ct. 133, 91 L.Ed. 103; Reilly v. Pinkus, 338 U.S. 269, 274, 276, 277, 70 S.Ct. 110, 94 L.Ed. 63; United States v. Storer Broadcasting Co., 351 U.S. 192, 203, 76 S.Ct. 763, 100 L.Ed. 1081; Federal Trade Commission v. Standard Oil Co., 355 U.S. 396, 400, 401, 78 S.Ct. 369, 2 L.Ed.2d 359; Federal Trade Commission v. Mandel Brothers, Inc., 359 U.S. 385, 79 S.Ct. 818, 3

confronting us. These few cases have delineated the controlling principles we must apply.

■ The landmark decision and the one most frequently cited is Universal Camera Corp. v. National Labor Relations Board, 340 U.S. 474, 71 S.Ct. 456, 463, 95 L.Ed. 456. In this decision the Supreme Court spelled out with care the general rules that should govern Courts of Appeal in their work of reviewing orders and/or decisions of administrative agencies. The Court held, inter alia, (in conformance with a requirement of the Administrative Procedure Act, 5 U.S.C. A. § 1001 et seq.) that such decisions must be supported by substantial evidence "on the record considered as a whole." If after canvassing and fairly assessing the entire record a reviewing court cannot conscientiously find that the evidence supporting an agency decision is substantial, "good conscience" dictates that the agency decision be reversed. In so appraising the whole record the reviewing court must take into account whatever in the record fairly detracts from the weight of the evidence which underlies the agency order and is "opposed to the agency's view."

The Court also indicated that an order of an administrative agency should be set aside unless justified "by a fair estimate of the worth of the testimony of witnesses *or its* [the agency's] informed judgment on matters within its special competence *or both*"; but the Court also emphasized that the requirement for "canvassing 'the whole record'" in order to ascertain substantiality, *was not "intended to negative* the function of the [there Labor] Board as one of those agencies presumably equipped or informed by experience to deal with a specializ-

L.Ed.2d 893; American Medicinal Products, Inc. v. Federal Trade Commission, 9 Cir., 136 F.2d 426, 427; Charles of the Ritz Distributors Corp. v. Federal Trade Commission, 2 Cir., 143 F.2d 676, 679, 680; J. E. Todd, Inc. v. Federal Trade Commission, 79 U.S.App.D.C. 288, 145 F.2d 858; Research Laboratories, Inc. v. United States, 9 Cir., 167 F.2d 410, 415, 416, certiorari denied 335 U.S. 843, 69 S.Ct. 65, 93 L.Ed. 393; Willapoint Oysters, Inc. v. Ewing, 9 Cir., 174 F.2d 676, 685, 689, 691, certiorari denied 338 U.S. 860, 70 S.Ct. 101, 94 L.Ed. 527; Bristol-Myers Co. v. Federal Trade Commission, 4 Cir., 185 F.2d 58, 61, 62; P. Lorillard Co. v. Federal Trade Commission, 4 Cir., 186 F.2d 52; National Labor Relations Board v. Howell Chevrolet Co., 9 Cir., 204 F.2d 79, 85; Koch v. Federal Trade Commission, 6 Cir., 206 F.2d 311, 315, 318, 319, 320; Standard Distributors, Inc. v. Federal Trade Commission, 2 Cir., 211 F.2d 7, 12; Dolcin Corp. v. Federal Trade Commission, 94 U.S.App.D.C. 247, 219 F.2d 742, 749, 751, 754, 755; Tractor Training Service v. Federal Trade Commission, 9 Cir., 227 F.2d 420, 425; Kalwajtys v. Federal Trade Commission, 7 Cir., 237 F.2d 654, 656, certiorari denied 352 U.S. 1025, 77 S.Ct. 591, 1 L.Ed.2d 597; De Gorter v. Federal Trade Commission, 9 Cir., 244 F.2d 270, 273, 281, 283; Goodman v. Federal Trade Commission, 9 Cir., 244 F.2d 584, 589, 591, 593, 594, 603, 604; Arrow Metal Products Corp. v. Federal Trade Commission, 3 Cir., 249 F.2d 83; Loesch v. Federal Trade Commission, 4 Cir., 257 F.2d 882, 885; G. H. Miller & Co. v. United States, 7 Cir., 260 F.2d 286, 296, 297, 302.

The following cases hold that the Commission has authority to resolve conflicts in expert medical testimony. Federal Trade Commission v. Raladam Co., 283 U.S. 643, 646, 51 S.Ct. 587, 75 L.Ed. 1324; Justin Haynes & Co. v. Federal Trade Commission, 2 Cir., 105 F.2d 988, 989; Dr. W. B. Caldwell, Inc. v. Federal Trade Commission, 7 Cir., 111 F.2d 889, 891; Neff v. Federal Trade Commission, 4 Cir., 117 F.2d 495, 497; D.D.D. Corp. v. Federal Trade Commission, 7 Cir., 125 F.2d 679, 680, 682; John J. Fulton Co. v. Federal Trade Commission, 9 Cir., 130 F.2d 85, 86, citing cases, certiorari denied 317 U.S. 679, 63 S.Ct. 158, 87 L.Ed. 544; Aronberg v. Federal Trade Commission, 7 Cir., 132 F.2d 165, 170.

It is for the Commission and not the courts to pass upon the credibility of witnesses and/or weight to be accorded their testimony. Tractor Training Service v. Federal Trade Commission, 9 Cir., 227 F.2d 420. Also see Corn Products Refining Co. v. Federal Trade Commission, 324 U.S. 726, 65 S.Ct. 961, 89 L.Ed. 1320; Federal Trade Commission v. Standard Education Society, 302 U.S. 112, 58 S.Ct. 113, 82 L.Ed. 141; Standard Distributors, Inc. v. Federal Trade Commission, supra; P. Lorillard Co. v. Federal Trade Commission, supra.

ed field of knowledge, whose findings within that field carry the authority of an expertness which courts do not possess and therefore must respect." (Emphasis supplied.)

In an opinion issued on the same day, the Supreme Court applied one of the principles announced in Universal Camera. National Labor Relations Board v. Pittsburgh Steamship Co., 340 U.S. 498, 71 S.Ct. 453, 456, 95 L.Ed. 479. It again emphasized the fact that Congress had charged the Courts of Appeal, and not the Supreme Court, with the normal and primary responsibility for granting or denying enforcement of Labor Board orders. It held that decisions of the Courts of Appeal would not be disturbed when they involve solely a fair assessment of a record on the issue of unsubstantiality; that the Supreme Court is not the place to review a conflict of evidence nor to reverse a Court of Appeals even if the Supreme Court (in the place of the Court of Appeals) would find the record tilting one way rather than the other, and even though fair-minded judges could find it tilting either way. The Court indicated its adherence to the rule that where conclusions of Courts of Appeal "depend on appreciation of circumstances which admit of different interpretations," the decision of that intermediate court should not be disturbed.

In Federal Trade Commission v. Standard Education Society, 302 U.S. 112, 58 S.Ct. 113, 116, 82 L.Ed. 141, the Court considered "unfair practices" related to the methods of sale of certain kinds of books. In passing upon the judicial function of a reviewing court the Court stated: "The courts do not have a right to ignore the plain mandate of the statute which makes the findings of the Commission conclusive as to the facts if supported by testimony. The courts cannot pick and choose bits of evidence to make findings of fact contrary to the findings of the Commission. The record in this case is filled with evidence of witnesses under oath which support the Commission's findings."

In Federal Trade Commission v. Algoma Lumber Co., 291 U.S. 67, 54 S.Ct. 315, 318, 78 L.Ed. 655, the Court again dealt with the findings of the Federal Trade Commission. In reversing a decision of this Court (Algoma Lumber Co. v. Federal Trade Commission, 64 F.2d 618) the Supreme Court quoted the Act here involved which provides: "The findings of the Commission as to facts, if supported by testimony, shall be conclusive." 15 U.S.C.A. § 45. It then went on to hold that "the Court of Appeals, though professing adherence to this mandate, honored it, we think, with lip service only. In form the court determined that the findings of unfair competition had no support whatever. In fact what the court did was to make its own appraisal of the testimony, picking and choosing for itself among uncertain and conflicting inferences. Statute and decision [citing Federal Trade Commission v. Pacific States Paper Trade Ass'n, 273 U.S. 52, 61, 63, 47 S.Ct. 255, 71 L.Ed. 534] forbid that exercise of power."

The Court concluded with a further holding that "the finding of unfair competition being supported by the testimony, the Commission did not abuse its discretion in reaching the conclusion that no change of the name short of the excision of the word 'white' would give adequate protection."

Applicability of the principles announced in the Standard Education Society and Algoma decisions, supra, to the problem of review confronting us in the instant case, is clearly demonstrated by the recent reversal of a decision of this court reported in Sewell v. Federal Trade Commission, 9 Cir., 240 F.2d 228. The Supreme Court reversed this decision in a per curiam opinion in which we were directed to "affirm and enforce the order of the Federal Trade Commission" on authority of the two Supreme Court decisions just above cited. See 353 U.S. 969, 77 S.Ct. 1055, 1056, 1 L.Ed.2d 1133.

The judge of this court [240 F.2d 235] who dissented in our Sewell opinion expressed the view that this court's

decision had "meddled in a decision which it is not authorized to make" and he predicated this conclusion on the holdings of the Supreme Court in the Algoma and Standard Education Society cases. The Supreme Court agreed with him.

A late decision of the Supreme Court directly touching the authority of the Commission to formulate orders designed to effectuate the conclusions it has reached, is Federal Trade Commission v. National Lead Co., 352 U.S. 419, 429, 77 S.Ct. 502, 509, 1 L.Ed.2d 438. In that case the Court cited an earlier case wherein it pointed out that "Congress had placed the primary responsibility for fashioning orders upon the Commission" —that the cases have served to narrow the issue to the question: "Does the remedy selected have a 'reasonable relation to the unlawful practices found to exist'." In this connection also see Federal Trade Commission v. Mandel Brothers, Inc., 359 U.S. 385, 79 S.Ct. 818, 3 L.Ed.2d 893.

▄▄▄ The Commission is deemed to have expert experience in dealing with matters of the character involved in the instant case. Federal Trade Commission v. R. F. Keppel & Bro., 1934, 291 U.S. 304, 314, 54 S.Ct. 423, 427, 78 L.Ed. 814. And it may draw upon its own experience in order to determine (even) in the absence of consumer testimony, the natural and probable result of the use of advertising expressions. E. F. Drew & Co. v. Federal Trade Commission, 2 Cir., 1956, 235 F.2d 735, 741. See footnote 60 in De Gorter v. Federal Trade Commission, 9 Cir., 244 F.2d 270, 283.

In the Keppel case, supra, the court also took occasion to emphasize that the Commission "was created with the avowed purpose of lodging the administrative functions committed to it in a 'body specially competent to deal with them [prac-

tices or methods of competition] by reason of information, experience and careful study of the business and economic conditions of the industry affected,' and it was organized in such a manner, with respect to the length and expiration of the terms of office of its members, as would 'give to them an opportunity to acquire the expertness in dealing with these special questions concerning industry that comes from experience.' "

In the margin [13] we cite a group of cases presenting typical examples of how federal courts have applied and elaborated upon vital phases of the problem which confronts us in the case at bar. We think that these decisions are in harmony with the basic principles laid down in the several decisions of the Supreme Court just above cited in this part of our opinion. In many instances these decisions dealt with challenges to the scope of authority of the Commission to make the particular findings involved which concerned facts in evidence, and/or to fashion a remedy or remedies which, under all of the evidence would best afford a just and rational solution for the evils revealed by the evidence.

### Part Three

The conclusions expressed below are intended as a supplement to what we have previously said concerning the several issues of law and fact presented in this long-drawn-out controversy.[14]

The many years consumed in this litigation, the claim of Carter that the Commission's Order will have ruinous effects on its business, the highly involved nature of the lengthy expert medical testimony in the record, plus the vigorous arguments of counsel covering practically all of the material issues of fact along with controversies over procedural points, have provided an added incentive to a scrutiny of the entire record with

---

13. See note 13 on Page 492.

14. On the day the Hearing Examiner announced that the record was (then) being closed in the last series of hearings, he stated to counsel that the hearing then

being concluded was the "149th hearing" in this long case; that "on the basis of a five day week, that is approximately three and a half months of actual, continuous hearings."

that degree of care suggested by the Supreme Court. Our scrutiny included a reading of the oral arguments of counsel before the Commission just prior to submission of the case (1956) to the Commission for its final decision on the merits.

In our appraisal and assessment of the record as a whole, we endeavored to make a fair estimate of the worth of the medical testimony of the expert witnesses, having in mind that in the last analysis, the evaluation of the Commission as to the weight to be given such testimony concerning medical truths was a matter committed for decision to the informed judgment of the Commission, and that making a primary decision on that question was a duty that fell within the area of its competence. So far as concerns any *conflicts* in such testimony, we are also of the view that all such conflicts presented questions of fact for resolution by the Commission and not for resolution by this court. See Irwin v. Federal Trade Commission, 8 Cir., 143 F.2d 316, 323, and note 13, supra.

Our assessment and estimate of the probative weight of the entire body of evidence also took into account the contradictory evidence offered by Carter from which conflicting inferences could be drawn which detract from the weight of the evidence supporting the Commission's view.

 The meaning of, and the truth or lack of truth in the florid advertising representations of Carter concerning the therapeutic worth of its pills,[15] *and also* the tendency or capacity of its elaborate advertising to mislead and/or deceive the using public, presented questions of fact to be determined by the Commission under all of the evidence (See Kalwajtys v. Federal Trade Commission, 7 Cir., 237 F.2d 654, 656.) Its conclusions on this phase of the case must be upheld by a reviewing court unless it can be said that the Commission's rulings on such questions were arbitrary or clearly wrong. Our conclusion is that the rulings here referred to are not to be condemned. The Commission did not err in making and entering its ultimate findings of fact which reflect its conclusions on these matters.

 To an overwhelming degree the expert testimony in this case dealt with highly complicated questions of fact, an-

15. Carter suggests that the Commission was here dealing with a case which involves "harmless therapeutic claims honestly made." It contends that at the time the Commission made its (1956) Order the record then before the Commission failed to reveal that there was a "general agreement of medical opinion" concerning the "falsity of the claim"; that for this reason we should reverse the Commission's Order under authority of the holding in Belmont Laboratories v. Federal Trade Commission, 3 Cir., 1939, 103 F.2d 538, 543. As we view this argument, it at least carries the suggestion that the Commission's Order should not be sustained by this court *if any conflict whatever* appears in the medical testimony of the expert witnesses concerning the truth or falsity of the various therapeutic claims appearing in Carter's advertising.

We cannot agree with the foregoing argument. The basic purpose of the entire proceeding was to inquire into the factual truth or falsity of many elaborate "therapeutic claims," employed in Carter's advertising. Whether these many "therapeutic claims" were true or false could only be demonstrated through the testimony of medical experts, and that course was followed. The record shows that when the proceedings ground to a close the parties were apparently in agreement that the dominating and controlling area of factual conflict in this case was what influence, if any, Carter's pills would have on the production and flow of liver bile. Carter claimed that the record then before the Commission demonstrated that its pills would produce that result. Its advertising in evidence had claimed that use of its pills would stimulate an increase in the production and flow of liver bile and thereby produce the many beneficial therapeutic results described in this lavish advertising. On the entire body of evidence and testimony the Commission finally decided that the several therapeutic claims of Carter which were carefully noted in its Order did constitute false and misleading advertising, and as such were unfair and deceptive acts and practices in commerce. We find no rational reason for disturbing the Commission's judgment on this point all as reflected in its Order.

swers to which had to be found in the realm of medical knowledge. We are fully persuaded that this court is without authority to substitute its judicial judgment on purely medical facts for that of the Commission by weighing the probative force and effect of a body of testimony dealing directly and exclusively with the effect of a certain combination of drugs on the human system. The function of weighing the rational probative force of such testimony was a primary duty imposed upon the Commission. Our assessment of the evidence and testimony leads to the conclusion that the order of the Commission was not clearly wrong nor was it arbitrary.

In argument supporting its claims of error Carter asserts that the Commission's own Findings and Opinion *demonstrate on their face* fatal defects of proof; that taken in light of the record as a whole, they demonstrate beyond peradventure of a doubt that there was *a complete abdication* by the Commission of its duty to weigh the proof in the record which fairly detracted from the weight of its own proof. It is urged that this abdication was due either to the Commission's complete disregard of evidence received or its exclusion of evidence offered by Carter.

It is also argued that every line of the Commission's Decision reflects "the unmistakable badges of a corrosive bias, of refusal even to explore (much less to rectify) the deficiencies of proof and procedure recommitted to it by this Court and a consistent demonstration of sheer abdication of its duty to weigh or consider the evidence."

We disagree with the contentions set forth in the two preceding paragraphs and we reject them as without real substance or merit.

 We also find no merit in Carter's claim of error based on the Commission's action in refusing to disqualify the Hearing Examiner and to terminate the proceedings. Furthermore, the reasons assigned to support Carter's general

claims of unfairness (including a denial of its demand to introduce additional evidence and for a de novo hearing before a different examiner on all of the issues in this litigation) do not appeal to us as possessing that degree of substance and real worth which would justify a reversal of the Commission's Order and possibly result in an indefinite continuation of this controversy. In this connection, we are also persuaded that the record, as a whole, fails to show that in this proceeding the actions of the Hearing Examiner and the Commission shifted the burden of proof to Carter. A contention to that effect is without merit.

 Viewing the record in its entirety, we find no sound reason which, in good conscience, would justify us in impeaching the substantiality, the evidentiary worth, force and persuasiveness, of the body of evidence which the Commission ultimately relied upon to support its Findings of Fact Nos. 3, 4, 18 and 20 to which we made specific reference earlier in this opinion. As we read the record it is plain that much that appears in these four findings is but a recapitulation or restatement of portions of the totality of facts as found by the Commission in some of its other findings. So far as concerns the factor of "substantiality," our considered judgment is that the body of evidence which sustains the four findings here mentioned was substantial and that this evidence provides adequate support for the Order here on review.

[16] Even the most casual inspection and appraisal of the entire record would reveal that in all material phases of the long controversy between the parties to this proceeding, the dominating fact issue stressed in the testimony of the expert medical witnesses was whether use of Carter's laxative pills would, or would not, have any influence in stimulating an increase in the *production* of bile by the liver and would or would not, increase the *flow* of liver bile.[15] (See footnote 7, supra.) From all of the evidence, the

15. See note 15 on Page 496.

Commission found as a fact that this particular claim which Carter characterizes as its "basic therapeutic claim" was false and misleading; that use of Carter's pills would have no effect whatever on functions of the liver, and would not cause the liver to produce *an increased flow* of bile nor would it have any influence in the *production* of bile by the liver. On this factual basis which directly concerned the therapeutic value of Carter's pills, the Commission Order also enjoins the further use of the word "liver" in the trade name of "Carter's Little Liver Pills." We think the Commission was acting well within the orbit of its authority when it ordered excision of the word "liver" from the trade name of Carter's product.

And we point out that despite Carter's sweeping claim in its brief that its business will be totally destroyed if the Commission's Order is sustained, the Order *does not* enjoin Carter from use of advertising claims concerning the *cathartic* properties of its pills *unless* such claims are of a character clearly prohibited by the express terms of the Commission's Order.

 The Commission concluded (in its Order) that "the acts and practices of the respondent, as herein found, are all to the prejudice and injury of the public and constitute unfair and deceptive acts and practices in commerce within the intent and meaning of the Federal Trade Commission Act." We agree with this conclusion. Furthermore, we think that the Commission made an allowable judgment in its choice of a remedy to be applied. The Commission is the expert body to determine *what remedy* is necessary to eliminate the unfair and deceptive practices disclosed by the record, and it has wide latitude for judgment. Shaping a remedy is essentially an administrative function. Congress has entrusted the Commission with the responsibility of selecting *the means* of achieving a statutory policy—the relation of remedy to policy is peculiarly a matter for administrative competence. Here, the Commission had discretion to fashion a remedy of a civil nature to attain the desired goals, and *its* choice fell within an allowable area of *its* discretion. Only in cases where the remedy selected has no reasonable relation to the unlawful practices found to exist, should a reviewing court interfere. We are convinced that this is a case where an interference by this court with the breadth of the Commission's Order would clearly lack justification.

The Act prescribes that the findings of the Commission as to the facts, if supported by evidence, shall be conclusive on a reviewing court. 15 U.S.C.A. § 45 (c). The Administrative Procedure Act added the further requirement that to be valid, the findings of federal administrative agencies must be supported by *substantial* evidence in the record considered as a whole. The record meets this test.

 Carter urges in its brief that this case is unique in the annals of Federal Trade Commission proceedings; that in view of the great age of the litigation, the end issue which involves purely questions of "general medical opinion," and particularly in view of "the changing nature of these specific medical frontiers"—where the criteria for establishing the truth or falsity of a therapeutic opinion are peculiarly in constant flux, this court should not only refuse to approve the Commission's Order but should remand the case to the Commission with directions to take additional evidence *which would show* that the entry and enforcement of the Commission's 1956 Order "is appropriate under present circumstances"—which evidence would also "reflect the present day status of these controversial medical topics."

Our answer to the foregoing claim is that the Commission was the body to decide whether (in 1956) the totality of evidence then in the record refuted the "therapeutic opinions" advanced by Carter in its profuse advertising claims and supported in the testimony of its witnesses. While Carter had pleaded in its Answer that it had abandoned the use of some of the advertising claims referred

to in the Commission's Complaint, nonetheless in this same pleading it also frankly avowed that "the advertising of Carter's Little Pills truthfully describe its properties." Its brief also urges that *its* convincing presentation of the merits of its case, and *its* analysis of *its evidence and its experiments,* should impel us to conclude that such a showing resulted in "fully establishing the truth of its therapeutic claims."

In argument to this court the Commission's brief urges that except as to the representations that Carter's laxative will effect the production or flow of bile, Carter's counsel made little or no effort to establish the truth of the many other representations made in Carter's advertising as to the therapeutic value of its laxative pill. (See footnote 7.)

It is our considered judgment that the instant Order of the Commission requiring Carter to cease and desist from further disseminating certain specified false and misleading claims concerning the therapeutic virtues of its pills, presents the only barrier to a possible renewed use of many or all of such therapeutic claims in any future advertising by Carter. On the whole record we would not be justified in substituting our judgment for that of the Commission in shaping the remedial provisions of its Order. The Commission urges in its briefs that there is *no evidence in the record* which would show that Carter had discontinued the various advertising statements found to be false and misleading, and which statements furnish the basis for the Commission's Order to cease and desist. In view of this situation and under all of the circumstances of this case we conclude, and therefore hold, that the Commission did not abuse its discretion in issuing this Order. See Marlene's Inc. v. Federal Trade Commission, 7 Cir., 216 F.2d 556, 559, 560.

The petition of Carter to reverse and set aside the Cease and Desist Order of the Commission is denied. The said Order is affirmed, and obedience to its terms is hereby Ordered.